CORNELIA P. HOTCHKIN, Appellant, *v.* THE THIRD NATIONAL BANK of Malone, Respondent.

The title of a purchaser to property sold to him on credit cannot be impeached by the vendor on the ground of false representations, without showing that, in giving the credit and parting with the property, he relied upon and was influenced by the representations.

While if a purchaser, who is insolvent, conceals that fact from the vendor for the purpose of defrauding him and thus obtains goods on credit without intending to pay for them, the title of the property is not changed and it may be reclaimed by the vendor, the mere omission of the purchaser to disclose his insolvency to the vendor, in the absence of any attempt to defraud, will not avoid the sale, although the fact, if known to the vendor, would have affected the purchaser's credit; the intent not to pay must have existed when the property was purchased.

In an action to recover possession of goods purchased by one F. of plaintiff and on credit, it was alleged, that the sale was induced by false representations, and that the goods were transferred to defendant as

security for a precedent debt. The following facts appeared: Prior to April 13, 1886, plaintiff had sold goods to F., generally for cash; on that day he asked to purchase on credit, and, upon being interrogated, made false representations as to his financial condition, he being at the time insolvent. The goods asked for were sold to him and were paid for; he stated at the time that he would want more goods later. Thereafter other sales were made to F., some for cash and some on credit, which were paid for. The goods sought to be recovered were sold to F. in October and November, without any further representations on his part, or requests for credit, but after frequent letters from plaintiff's agent in which F. was strongly urged, and great inducements were held out to him to make purchases on credit ; after he had repeatedly declined so to do. There was no proof or finding that plaintiff, in making these sales, was induced thereto by, and relied upon, the representations made in April. F., at the time he purchased, was insolvent; he owed a large amount, and had mortgaged or executed bills of sale of all his property to his creditors, which mortgages were not filed until after his death ; this occurred suddenly in March, 1887 ; a small judgment had been obtained against him, but after the purchase in question. The goods so obtained, F. almost immediately mortgaged or transferred by bills of sale to defendant to obtain aid in his business; they, however, remained in the possession of F., to be sold in the usual course of business. At the time of F.'s death, none of his creditors were pressing him, his indebtedness was decreasing and his financial condition improving; he possessed the confidence of the community, conducted a large business and was in possession of a large amount of property. He was sheriff of the county at the time and was in receipt from that office of at least $3,500 annually. *Held* (VANN, J., dissenting), the evidence failed to establish that the sale in question was induced by false representations, and did not justify a finding that F., at the times they were made, fraudulently concealed his insolvency and obtained the property with the preconceived design not to pay therefor.

(Argued April 22, 1891; decided June 9, 1891.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made September 9, 1890, which reversed a judgment in favor of the plaintiff, entered upon the report of a referee and granted a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*P. B. McLennan* for appellant. The false representations made in April, 1886, and the circumstances attending the

transaction at that time, showed an intention to defraud in the later purchases. (*Zabriskie* v. *Smith*, 13 N. Y. 322.) Folsom was hopelessly insolvent at the time he purchased and received the property in question, and knew himself to be so. (*Parker* v. *G. Cl., M. & R. Co.*, 617; *Dingy Co.* v. *O'Brien*, 123 Mass. 12; *Brown* v. *Montgomery*, 20 N. Y. 287; *Jordan* v. *Osgood*, 109 Mass. 557; 2 Wait's Law and Prac. 106; *Queen* v. *Stadlers Co.*, 10 H. L. Cas. 404; *Hayes* v. *Morrell*, 14 Penn. St. 48.) The goods in question were purchased of the plaintiff by Folsom in October and November, 1886, with the preconceived design and intent of not paying for the same. (*W. W. Works* v. *Morse*, 17 Am. Rep. 1007; *Ross* v. *Miner*, 35 N. W. Rep. 60; 1 Benj. on Sales, § 525; *Stuart* v. *Emerson*, 52 N. H. 301; *Johnson* v. *Morrell*, 2 Keyes, 664; *Pike* v. *Wieling*, 49 Barb. 314; *Roebling* v. *Duncan*, 67 N. Y. 598.) The purchase of the goods in question was a fraud upon the part of Folsom and no title passed to him. (*Wright* v. *Brown*, 67 N. Y. 1–6; *Devoe* v. *Brown*, 53 id. 462; *Pike* v. *Wieting*, 49 Barb. 314.) The defendant took with knowledge of the fraud and is not a *bona fide* purchaser. (*Williamson* v. *Brown*, 15 N. Y. 354; *Reed* v. *Gannon*, 50 id. 345; *Baker* v. *Bliss*, 39 id. 70; *Ellis* v. *Howman*, 90 id. 473, 474; *Danforth* v. *Daut*, 4 Duer, 101; *Stearns* v. *Gage*, 79 N. Y. 106; *Pringle* v. *Phillips*, 5 Sandf. 159; *Weaver* v. *Barden*, 49 N. Y. 286; *Stevens* v. *Brennan*, 79 id. 254; *Cary* v. *White*, 52 id. 141; *Root* v. *French*, 13 Wend. 570; *Barnard* v. *Campbell*, 58 N. Y. 73.) The bills of sale were fraudulent and void. (*Siedenbach* v. *Riley*, 111 N. Y. 560; *Otis* v. *Still*, 8 Barb. 102; *Camp* v. *Camp*, 2 Hill, 628; *Hanford* v. *Artcher*, 4 id. 271; *Steel* v. *Benham*, 84 N. Y. 634; *Crandall* v. *Brown*, 18 Hun, 461; *Ford* v. *Williams*, 24 N. Y. 35; *Wood* v. *Lowry*, 17 Wend. 492; *Stewart* v. *Slater*, 6 Duer, 90; *Dutcher* v. *Swartwood*, 15 Hun, 34; *Stimson* v. *Wrigley*, 86 N. Y. 332; *Potts* v. *Hart*, 99 id. 168; *Southard* v. *Benner*, 72 id. 424; *Sperry* v. *Baldwin*, 46 Hun, 120; *Q. & N. B. Co.* v. *Hart*, 48 id. 395; *Bainbridge* v. *Richmon*, 17 id. 391.) It is always competent to show that a vendor relied

·upon representations made by the vendee. It is equally competent to show that the vendor relied upon the existence of certain facts known to the vendee and concealed by him from the vendor. (*Leroy* v. *Rogers*, 2 J. & S. 64.) It was competent to prove the representation made by Folsom to Wilder in February, 1886. (*Hall* v. *Taylor*, 18 N. Y. 588; *Miller* ·v. *Barber*, 66 id. 568.)

*Wm. P. Cantwell* for respondent. The referee does not find in his report that the plaintiff, or her agent, A. J. Hotchkin, believed or relied upon the alleged representations, or were induced thereby to part with the property. This is essential to a recovery in such an action. Without this essential finding of fact the referee's judgment is unsupported, and ·ought to be reversed. (*Taylor* v. *Guest*, 58 N. Y. 262; *Addington* v. *Allen*, 11 Wend. 374, 403; *Smith* v. *Devlin*, :23 N. Y. 365; *Jarvis* v. *Jarvis*, 66 Barb. 331; *Armstrong* ·v. *Bicknell*, 2 Lans. 221; *Collins* v. *Clark*, 54 Barb. 184.) This action rests upon the alleged fraud committed by Lyman ·J. Folsom in buying the carriages in question from the plaintiff. Unless such fraud in the purchase be established, there ·can be no recovery in any view of the case. (*Clark* v. *Dillon*, 97 N. Y. 370; *Malone* v. *Sherman*, 17 J. & S. 530; 1 Rumsey's Pr. 270, § 419.) An intent to defraud cannot be imputed to a party who contracts a debt even knowing that he ·is insolvent, merely from the fact of his insolvency, and his omission upon a purchase of property upon credit to disclose such condition to his vendor. (*Morris* v. *Talcott*, 96 N. Y. 100, 107; *Nichols* v. *Pinner*, 18 id. 295; 23 id. 264; *Wright* v. *Brown*, 67 id. 9; *People's Bank* v. *Bogart*, 81 id. 108; *Van Dyke* v. *McQuade*, 86 id. 38; *Swarthout* v. *Merchant*, 47 Hun, 106.) The burden of proof as to fraudulent intent rests upon the plaintiff. (*Coffin* ·v. *Hollister*, 36 N. Y. S. R. 271, 272; *Woodworth* v. *Sweet*, .51 N. Y. 8; *R. P. Co.* v. *O'Brien*, 36 Hun, 79; *Parker* v. ·*Conner*, 93 N. Y. 118; *Belmont* v. *Lane*, 22 How. Pr. 365; *Talcott* v. *Rosendale*, 22 Hun, 573; *Millikin* v. *Dart*, 26 id.

24 ; *Trim* v. *Smith*, 13 Abb. [N. C.] 35.)   The alleged fraud-
ulent representations, without sufficient proof of which the
plaintiff's case must be fatally defective, were found by the
referee upon the uncorroborated testimony of the plaintiff's
husband and manager, though that testimony was impaired,
discredited and contradicted.   This was an error for which
a new trial should have been granted, especially when
it appeared by his opinion that the referee in effect disre-
garded the testimony of Sears.   (*Dean* v. *Van Nostrand*,
23 Wkly. Dig. 97 ; *Kearney* v. *Mayor, etc.*, 92 N. Y.
617 ; *Nicholson* v. *Connor*, 8 Daly, 212 ; *Roberts* v. *Gee*,
15 Barb. 449 ; *Kavanaugh* v. *Wilson*, 70 N. Y. 177.)   The
defendant acquired a valid legal title to the carriages.   (*Dud-
ley* v. *Danforth*, 61· N. Y. 626 ; *Malcom* v. *Laveridge*, 13
Barb. 372 ; *Mowry* v. *Walsh*, 8 Cow. 238 ; *Starin* v. *Kelly*,
38 N. Y. 419 ; *Simpson* v. *Del Hoyo*, 94 id. 189 ; *Murphy*
v. *Briggs*, 89 id. 446 ; *Parker* v. *Conner*, 93 id. 118 ; 2 R.
S. 137, § 5 ; *Etting* v. *Vanderlyn*, 4 Johns. 237 ; *King* v.
*Upton*, 4 Me. 387 ; *Giles* v. *Ackles*, 9 Penn. St. 147 ; *Butler*
v. *Miller*, 1 N. Y. 496 ; *Fox* v. *Burns*, 12 Barb. 677, 678 ;
*Brown* v. *Bement*, 8 Johns. 96 ; *Case* v. *Broughton*, 11
Wend. 106, 109 ; *Dane* v. *Mallory*, 16 Barb. 46, 49 ; *Burdick*
v. *McVanner*, 2 Den. 170 ; *Galen* v. *Brown*, 22 N. Y. 37,
39 ; *Parshall* v. *Eggart*, 54 id. 23 ; *Smith* v. *Acker*, 23 Wend.
667 ; *Fuller* v. *Acker*, 1 Hill, 475 ; *Quarles* v. *George*, 23
Pick. 401.)   Plaintiff is not a judgment creditor.   (*Wiletts* v.
*Vandenburgh*, 34 Barb. 424 ; *Dunlevy* v. *Tallmadge*, 32 N.
Y. 457, 460 ; *Van Buskirk* v. *Warren*, 34 Barb. 457 ; *Sturges*
v. *Vanderbilt*, 73 N. Y. 385 ; *Adsit* v. *Butler*, 87 id. 585 ;
*Anthony* v. *Wood*, 96 id. 180 ; *Scythe Co.* v. *Foster*, 36 id. 560 ;
*Throop Co.* v. *Smith*, 110 id. 83, 87 ; *Harvey* v. *McDonnell*,
23 N. Y. S. R. 501 ; Code Civ. Pro. § 1871.)   There has
been no effectual rescission of the contract, of which the
plaintiff has enjoyed the full fruits.   (*Brackett* v. *Gris-
wold*, 112 N. Y. 467.)   Improper evidence was received upon
the trial.   (*Ayers* v. *Water Commissioners*, 22 Hun, 297, 298 ;
*Bank of the Commonwealth* v. *Mudgett*, 44 N. Y. 514, 522,

523; *Cowdrey* v. *Coit*, 44 id. 382, 391; *Learned* v. *Ryder*, 61 Barb. 552; *Rawles* v. *A. M. L. Ins. Co.*, 27 N. Y. 282; *Newell* v. *Doty*, 33 id. 94; Abb. Trial Ev. 12, 13; *Paige* v. *Cagwin*, 7 Hill, 361; *F. S., etc., Co.* v. *Dodge*, 93 U. S. 379; *Bullis* v. *Montgomery*, 50 N. Y. 358; *Foote* v. *Beecher*, 78 id. 155; *Holcomb* v. *Holcomb*, 95 id. 316; *Carroll* v. *Deimel*, Id. 252, 256; *Schoonmaker* v. *Walford*, 20 Hun, 166.) The General Term had the power, and it was their duty, to inquire whether the findings accorded with the weight of evidence, and, if not, to reverse them. (*Loeschick* v. *Baldwin*, 38 N. Y. 326; *Smith* v. *Æ. L. Ins. Co.*, 49 id. 211; *Godfrey* v. *Moser*, 66 id. 250; *Moran* v. *McLarty*, 75 id. 25.)

*John I. Gilbert* for respondent. The evidence of Hotchkin should be received, if at all, with great caution. (Code Civ. Pro. § 829; *Renwick* v. *N. Y. C. & H. R. R. R. Co.*, 36 N. Y. 132; *Kearney* v. *City of New York*, 92 id. 617; *Elwood* v. *W. U. T. Co.*, 45 id. 549; *Nicholson* v. *Conner*, 8 Daly, 215.) The legal presumption is against fraud. (*Nichols* v. *Prinner*, 18 N. Y. 295; *Brackett* v. *Griswold*, 112 id. 454; *Morris* v. *Talcott*, 96 id. 100.) Folsom was under no obligation to disclose his financial standing. (*Van Duyck* v. *McQuade*, 86 N. Y. 38.)

BROWN, J. This action was brought to recover the possession of a lot of top buggies alleged to have been fraudulently obtained from the plaintiff by one Lyman J. Folsom in the months of October and November, 1886, and by said Folsom transferred to the defendant as security for the payment of a precedent debt. The plaintiff had judgment upon the referee's report for the possession of thirty-nine of the buggies. The order of the General Term which reversed the judgment and from which this appeal is taken was upon questions of fact and law, hence both are open to our consideration.

The complaint alleged that Folsom obtained the property in question in the months of October, November and December, 1886, and with intent to defraud the plaintiff and induce her

to deliver said property to him on credit, falsely and fraudulently represented himself to be financially good and solvent and worth the sum of fifteen thousand dollars, and that the plaintiff, believing and relying upon such representations and believing said Folsom to be solvent, was induced to deliver said property to him upon credit, and that said Folsom obtained the same with a preconceived design and intent not to pay therefor.

It further alleged that Folsom was insolvent at the time aforesaid and knew himself to be so.   That he had transferred and delivered the property to the defendant as security for the payment of a precedent debt and that defendant was not a *bona fide* purchaser thereof.

It further alleged a demand for the possession of the property and an unlawful refusal and detention thereof by defendant.

The answer denied any fraud upon the part of Folsom and alleged that defendant was a purchaser in good faith of the property in question.   To substantiate the allegations of her complaint the plaintiff proved by Alfred J. Hotchkin, her husband, who was her agent and general business manager, that on April 13, 1886, Folsom came to his office in Syracuse and said he had come to buy some carriages if they could agree on price.   There had been sales to Folsom prior to this date, but generally for cash.   The witness asked him if he wished to buy for cash and he said no, he wished to buy on time.   The witness then continued as follows : " I said we have sold you before for cash and not on time ; how is your financial condition ? "   He said : " I am good for what I wish to buy.   I am solvent and am worth $15,000."   I then asked him if he would wish to buy more than the number he had named and he said " Not to day, but will want more later on, that it was early for him to buy buggies at that time. "   I then asked him "if three or four months draft or note would be satisfactory and he replied that it would, and I filled out an order and he signed it."

This is the only evidence contained in the case of a representation made by Folsom as to his financial condition which

plaintiff claims influenced her in making the sale in question. There was evidence that in February, 1886, Folsom made some statements as to his condition to one Wilder, a traveling salesman for the plaintiff, but it does not appear that these statements were communicated to plaintiff or her husband, and the referee specifically found that they were not relied upon in selling the property which is the subject of this action. The wagons that were purchased in April were paid for, and between that date and the month of October other sales were made by plaintiff to Folsom, some for cash and one on a credit of three months, which was also paid.

The buggies which were transferred to the defendant were sold to Folsom in the months of October and November, and it is conceded that no representations were made by Folsom at that time; and if those sales were induced by any statements as to his financial condition, they were those of April thirteenth which I have quoted; but the referee did not find that the sales of October and November were induced by the representations made in April, nor did he find that plaintiff relied upon that representation in making those sales.

The finding is: "That upon the 13th day of April, 1886, said Folsom, for the purpose of obtaining carriages from the plaintiff *at that time* upon credit, and for the purpose of obtaining *further credit*, falsely represented himself as solvent and worth fifteen thousand dollars." As has already been stated carriages bought on April thirteenth were paid for, as were most of those purchased during the summer of 1886.

The title of the defendant could not be impeached on the ground that the property was obtained from the plaintiff by the false representations of Folsom without showing that in parting with the property the plaintiff was influenced by those representations, and to show this it must appear that she relied upon them in giving the credit upon the sale.

Fraud without damage or damage without fraud will not sustain an action for deceit, and a false and fraudulent representation made by one party to induce a contract entered into by another, is not actionable, unless the party to whom it was

made believed the representation to be true and acted upon the faith of it to his damage.  (*Allen* v. *Addington*, 7 Wend. 9 ; *Oberlander* v. *Spiess*, 45 N. Y. 175 ; *Lefler* v. *Field*, 52 N. Y. 621 ; *Taylor* v. *Guest*, 58 id. 266.)

The essential elements of an action for false pretenses are representations, falsity, scienter, deception and injury. (*Arthur* v. *Griswold*, 55 N. Y. 400.)

In a legal sense a person is not damaged by a false representation by which he is not influenced.  (*Taylor* v. *Guest*, *supra*.)

And in *Brackett* v. *Griswold* (112 N. Y. 454), it is said "there must have been false representations, known to be such, calculated and intended to influence the plaintiff, and in reliance upon which he in good faith parted with property."

All these circumstances must be found to exist, and the absence of any one of them is fatal to a recovery.

The judgment of the trial court cannot be upheld therefor upon the findings in reference to the false representations of April thirteenth.   There is not alone an absence of any finding that such representations were relied upon by plaintiff or influenced her in making the October and November sales, but there is a total absence of any fact found by the referee connecting those sales in any way with the representations made in April, and there is nothing in the opinion of the referee from which it can be inferred that he intended to decide that the October and November sales were induced by the representations made in April.   It becomes unnecessary, therefore, for us to examine the evidence to determine whether the facts that those representations were made and were false were supported by the weight of testimony, for we need not consider further a branch of the case which was rejected by the referee.

The referee found, however, "that at the time Folsom purchased and received said carriages, he was insolvent, knew himself to be insolvent, fraudulently concealed his insolvency from the plaintiff, and must necessarily have known that he could not continue in business and pay for said property.

That the said goods were purchased and received of the plaintiff by said Folsom fraudulently with the preconceived design and intent not to pay for the same."

If a purchaser who is insolvent conceals that fact from the vendor for the purpose of defrauding him, and thus obtains goods without intending to pay for them, the title of the property is not changed, and it may be reclaimed by the vendor. (*Durell* v. *Haley*, 1 Paige, 492; *Ash* v. *Putnam*, 1 Hill, 302; *Ferguson* v. *Carrington*, 9 B. & C. 59; *Devoe* v. *Brandt*, 53 N. Y. 462; *Wright* v. *Brown*, 67 id. 1.) Therefore, if the findings I have quoted are sustained by the weight of testimony, they will uphold the judgment of the trial court.

I shall assume that Folsom was insolvent in October, 1886, and must have known that fact, but I think the evidence does not support the conclusion that he knew he could not continue in business and pay for the carriages, and that he acquired the property with a preconceived design not to pay for the same.

The reasons given for the conclusion of the learned referee are: First, Folsom's insolvency and large indebtedness. Second, that he had mortgaged all his property to his numerous creditors, which mortgages were not filed until after his death, and that he had been sued and a small judgment recovered against him; and third, that all the carriages obtained from the plaintiff were almost immediately transferred to the defendant.

I am unable to perceive how the fact that the chattel mortgages and bills of sale were not filed indicated a fraudulent intent on Folsom's part in procuring the property in question.

The chattel mortgage to Adams for $6,000, was executed in January, 1886, and the bill of sale to Shields & Shane, conveying personal property, notes and accounts to an amount in excess of $26,000, was executed in February of the same year. Neither were filed until after his death. If the securities and the fact that they were not filed are indications of a fraudulent intent in the purchase of property by Folsom, that inference would be as strong as to purchasers prior to October as after, and yet we find that purchases made of the plaintiff in April and throughout the summer were paid for and during the

same period Folsom was actively engaged in business buying
from other manufacturers and not a single fraudulent act on
his part prior to the sales of plaintiff in October is proven or
suggested.

The inference of fraud from the giving and failing to file
the various chattel mortgages is greatly weakened if not totally
destroyed when we find that Folsom to the day of his death,
was conducting his business in the usual way, dealing with
many persons with no charge of fraud against him, except the
single one involved in this action.    Moreover, I do not see how
the failure to file the chattel mortgages and bills of sale or to
take possession of the property is to be regarded as Folsom's
act.    It is true in some instances he requested it, but the
various mortgagees could at any time have filed their securities
and their failure to do so indicates a leniency on their part
towards their debtor, born of their confidence in him and of
his honesty in dealing.

It is true that Folsom's indebtedness was large and especially
so to the three banks at Malone, but none of his creditors were
pressing him and no suits were pending against him and no
judgment was recovered against him until after the sales in
question, and then only for the small sum of $190.    That he
had the confidence of his creditors is indicated by their leniency
towards him, and their apparent confidence in his business
ability.    But it appears that his indebtedness was decreasing,
not growing.

Mr. French, the cashier of the People's Bank, testified that
from October 1, 1886, to January 1, 1887, Folsom's indebted-
ness to that bank was reduced twenty-five hundred dollars, and
Mr. Pease, the cashier of the defendant bank, testified that
shortly before his death, Folsom reduced his indebtedness in
that bank.    Nothwithstanding some losses, his financial con-
dition in January, 1887, was better and stronger than in Octo-
ber when the first lot of wagons in question were sold to him
by the plaintiff.

It is also true that the buggies soon after their receipt by
Folsom were by bill of sale transferred to the defendant bank,

but this transfer was not made with any intent to cheat the plaintiff or to dispose of the property for any fraudulent purpose, but in aid and assistance of his business.

As has already appeared, the bills of sale were not filed and the wagons remained in Folsom's possession to be sold in the usual course of business in the spring when there was a market for them.

The same may be said of the chattel mortgage to Adams & Martin who were indorsers on an over-due promissory note of $2,000, held by the People's Bank.

There is nothing in the general appearance of Folsom's business in the fall of 1886, as disclosed by the record, that indicates impending failure. No creditors were pressing him, but all were lenient and apparently satisfied with the situation.

There was no market for his stock of wagons until spring, and apparently there was a reasonable hope and expectation of a profitable business at that time and with the sale of his stock a reduction of indebtedness and an improved financial condition. He possessed the confidence of the community in which he lived, conducted a large business, kept a livery stable and operated a stage line and was in possession of a large amount of property. He was the sheriff of the county, holding that office for a second term, and in the enjoyment of an annual income therefrom of at least thirty-five hundred dollars.

It is important in looking at his business prospects and endeavoring to determine the probability of his paying for property bought in the fall of 1886, to bear in mind that he died suddenly on the 1st of March, 1887.

It is not just, therefore, to look at the situation as it existed after his death. The abrupt termination of his personal conduct of the business caused results not only unexpected, but which probably would not have occurred if he had lived.

The indebtedness to plaintiff did not mature until June and July following. Before that time elapsed the buggies would, in all probability have been sold, and the proceeds of the sales been available in his business. With his death there was nothing to do but settle his estate with the usual result of

forced sales and liquidation and rapid depreciation of the value of his property.

Many a business man, if compelled to go into liquidation on a given day, would find himself insolvent; whereas, if allowed to close up his business in his own way would realize more than sufficient to pay his debts, and many men have bridged over a worse situation than confronted Folsom in the fall of 1886. Every failure has its accumulation of embarrassments, but it cannot be said in this case that had Folsom lived he might not have extricated himself from his difficulties.

Thus far I have attempted to examine the general appearance of Folsom's business as disclosed by the record. To my mind it does not show him to be a dishonest man, and in this connection it is a fact of great weight that, notwithstanding his business life was open to the scrutiny of the plaintiff, no witness testified to a single act indicating fraud in another transaction.

Let us now look briefly at the immediate transaction involved in this suit.

The usual concomitant of fraud is a desire and effort on the part of the fraudulent purchaser to get possession of the property. Terms and conditions and length of credit are of no importance. So long as the possession of property is obtained, the fraudulent purpose is accomplished and all conditions of sale are but unimportant incidents of the transaction.

The negotiations leading to the delivery of the wagons are all in writing and speak for themselves. The first was instituted by the plaintiff in a letter to Folsom written by her husband from Syracuse under date of September 28, 1886, in which he said : " If you want to make some money I will give you a chance now." Then followed an offer to sell 50 buggies on eight months credit and a description of the wagons following which he says, " This is a splendid chance for you."

Two days after, not having a reply to his letter, Hotchkin wrote him again, saying: " I wrote you several days ago making you special low offer on 50 buggies and on favorable terms. Please let me hear from you by next mail."

But Folsom did not reply until October sixth, when he telegraphed: "Send me one sample carriage. Will buy more if suits." The sample carriage was sent and on the ninth of October Hotchkin writes again, saying Folsom had better send his order by next mail " as they are selling very fast."

On October eleventh the order was sent and the wagons were shipped and the first sale was completed.

On November 6, 1886, Hotchkin began negotiations for another sale, by letter of that date, in which he said: " If you want another bargain and will keep prices to yourself I will sell you 50 Brewster buggies at $65 each, same terms as before, if order is sent by return mail. The lowest price will be after December first $75. * * * If you want this chance you had better gobble it at once. You can advise by telegram at my expense or they may be sold."

Folsom, notwithstanding the chance that the buggies would all be sold, did not advise by telegram or order by return mail, but waited until November fifteenth when he wrote that he would take 35 side-spring buggies of the same kind as the October order and at the same price and 15 Brewsters on eight months credit from December 1st.

On the following day Hotchkin replied that he had only twenty-five side-spring and that he would have no more of either kind at the price named, and then says: " This is the last chance. I have made this offer to a party in Elmira for net cash and expect his order to-morrow, so if you want them you had better telegraph me to-morrow morning. First come, first served."

But notwithstanding this seductive offer and the probability that Hotchkin would sell to his Elmira customer for net cash instead of on eight months' time Folsom did not reply, and two days later Hotchkin telegraphed: " Do you want the buggies?" Evidently the " Elmira party " did not want them and apparently neither did Folsom, for he replied: " Will take twenty-five side-springs. Don't want any Brewsters."

But the next day the price for Brewsters fell and Hotchkin telegraphed: " Will make price sixty dollars on twenty-five

Brewsters; answer." And Folsom answered: "Will take side-springs. Don't want any Brewsters."

But Hotchkin's auction had not yet closed and he immediately telegraphed, "Will sell twenty-five Brewsters at fifty-five dollars. Last chance. Answer." And Folsom took them at the last offer on a credit of four months' note and an agreement by Hotchkin to renew for an additional four months, and the second sale was concluded.

Now, it is impossible for anyone to read this correspondence and say that it indicates fraud on Folsom's part. Indeed, one is amused at the persistency of Hotchkin in his efforts to sell his property, and his statements that the wagons are "selling fast," and that "another party will take them for cash to-morrow;" "that the price will go up after December first," and unless Folsom "telegraphs his order, the opportunity will be gone," his rapid reduction in the price when Folsom hesitates and his advice to "gobble them at once."

What the transaction does indicate is, on the one hand a manufacturer with a large stock of wagons in the fall of the year, who desires to sell them at low figures and who is willing to take commercial paper on long time, upon which he can realize the money. On the other hand, a cautious dealer induced to become a purchaser by the exceptionally low price and long credit offered and who expects to realize on sales of the wagons before his paper matures. In this connection the evidence of Charles Fury is very significant. He was in the employ of Folsom until December, 1886, and he testifies that he saw the letters from Hotchkin and that Folsom consulted with him as to whether it would be safe to rely on the promise to renew his paper at the end of four months in the event of Hotchkin failing in the meantime. Also as to the probability of his being able within the further period of four months to make sales and meet the renewed paper, and that the result of that consultation was the order for the carriages.

This evidence shows Folsom's mind on the subject and absolutely destroys all inference of fraud. He had reason to be apprehensive as to the plaintiff's responsibility on account of

the husband's former failure in the same business, and it shows that he was calculating the chances of his business enabling him to sell the wagons during the term of credit and meet his obligations when they matured.

Our conclusion is that the weight of evidence is against the finding that Folsom, when he bought the wagons, knew that he could not pay for them, and that he purchased them with a preconceived intent not to pay for them.

There is nothing, therefore, left to uphold the referee's judgment except that Folsom knew that he was insolvent when he made the purchases and did not disclose that fact to the plaintiff. But this is not sufficient. The law is well settled in this state that the mere omission of a purchaser of goods on credit to disclose his insolvency to the vendor, in the absence of any attempt to defraud, is not such a concealment as will avoid the sale, although the fact, if known to the seller, would affect his credit. (*Nichols* v. *Pinner*, 18 N. Y. 295; *People's Bank* v. *Bogart*, 81 id. 101–108; *Morris* v. *Talcott*, 96 id. 107; *Macullar* v. *McKinley*, 99 id. 353; *Coffin* v. *Hollister*, 27 N. Y. S. R. 637.)

The intent not to pay must exist when the property is purchased, and without proof of such an intent a judgment for the plaintiff cannot be sustained. (*Brackett* v. *Griswold*, *supra*.)

Mere insolvency undisclosed is not enough. We are of the opinion that the General Term was right in reversing the judgment.

The order appealed from should be affirmed and judgment absolute rendered against the appellant, with costs.

VANN, J. (dissenting). The judgment about to be rendered by the court impresses me as opposed to the weight of evidence given upon the trial. I do not intend to engage in an extended discussion of the facts, but will allude to enough of the evidence to define my position and, *me judice*, justify my vote to reverse the judgment of the General Term and affirm that of the referee. The question presented for decision is

whether Lyman J. Folsom practiced deception in order to induce the plaintiff to part with her property. A careful consideration of all the evidence has convinced me that he deceived her both by the statement of what was false and by the concealment of what was true.

On the 13th of April, 1886, Folsom, offering to buy goods of the plaintiff and stating that he should want more in the future, represented to her that he was solvent and worth $15,000. Three months before he had given a chattel mortgage to Adams for $6,000, and within less than two months before another to Shields and others for $10,000, subject to a third for $1,000, covering most of the personal property that he had and all that he was using in his business. Two other mortgages on his livery stock, one three years old and the other two, amounting to $1,500, remained unpaid at this time. None of these mortgages were filed. His real estate was already mortgaged to its full value, except one parcel, and when the representations were made he had very little property free from incumbrance, or available to pay his unsecured debts amounting to some thousands of dollars. According to the most charitable definition of insolvency he was insolvent, because he had not property enough to pay his debts and, as every man in the absence of proof to the contrary is presumed to know the situation of his own affairs, it must be assumed that he knew he was insolvent, especially as he was a good bookkeeper and a good business man. Having established his credit with the plaintiff he bought goods of her to a small amount, which he subsequently paid. He was then ready to load up and fail, and the eagerness of the plaintiff to sell goods to a man worth $15,000, as she supposed, made her an easy victim. During the month of September, 1886, in order to secure previous indorsements, he gave two bills of sale, one covering his interest in a crop of hops and the other embracing his horses, wagons, sleighs and all the property used in his livery business, and neither of these were filed. Even notes, accounts and all his evidences of debt were included in one of these instruments, as well as cash on hand and estimated profits.

October 11, 1886, he bought of the plaintiff fifty carriages, for which he agreed to pay her $2,250 in eight months, and one month later he gave a bill of sale to the defendant for thirty of said carriages to secure over-drafts and past due paper.

November 20, 1886, he bought of the plaintiff fifty more carriages, for which he agreed to pay $2,500 eight months thereafter. He waited until the last of these carriages was delivered, when, about December 13, 1886, he gave a bill of sale to the defendant covering this lot also, to secure a past indebtedness of $3,500. Neither of these instruments was filed.

December 28, 1886, he gave a chattel mortgage for $1,000, apparently a renewal, that was filed, and January 19, 1887, he mortgaged the rest of his real estate for $6,000 to secure an indorser, and this mortgage was not recorded. On the twenty-fourth of the same month he gave a bill of sale covering forty of the carriages, that he had purchased of the plaintiff, to secure his indorsers upon a note past due and under protest for more than four months, but it was not filed. The omission to file and record might be regarded as a remarkable coincidence if he had not, in several instances, made a request upon the subject to the holder of the security. The property embraced in all of these bills of sale and chattel mortgages remained in his possession, the same as if they had not been given.

Before he purchased said carriages of the plaintiff he had given bills of sale or chattel mortgages covering substantially all his personal property, so that nothing was realized therefrom above the encumbrances. At the same time his real estate was all mortgaged to its full value, except one parcel, and that was likewise fully encumbered within a brief period thereafter. His subsequent transfers were, therefore, necessarily confined to property subsequently acquired and that was mainly obtained from the plaintiff.

From May, 1886, until March, 1887, when he died, he had notes protested repeatedly and the protests were especially numerous during the period when he bought the carriages in

the months of October and November, 1886. He had
thousands of dollars in commercial paper under protest, some
of it several months past due, each time that he ordered goods
of the plaintiff in the fall of 1886. At the date of his death
his assets available to pay unsecured debts, amounted to only
$1,400, even before the expenses of administration had been
deducted, or not enough to pay more than five or ten per cent
thereof.

The interest on one of the mortgages on the house in which
he lived had not been paid for nearly six years. He had even
assigned as collateral security the accounts due him as sheriff
and the insurance upon his life.

I do not mention other dispositions of his property and
other circumstances having an incidental bearing upon the
question of fraudulent intent, as I rely upon the main facts of
known insolvency, deliberate misrepresentation and active
concealment, to demonstrate a furtive intent in obtaining the
property.

The referee found that Folsom made the false representa-
tions for the purpose of obtaining credit at the time and
further credit in the future; that he had then executed secret
transfers of substantially all his personal property and fraudu-
lently concealed them from the plaintiff and his other creditors;
that when he bought the goods in question of her and for some
time prior his checks and commercial paper had been pro-
tested and remained dishonored in the three banks of Malone,
including that of the defendant; that at the same time, while
remaining in the possession of a large amount of personal
property, including a stock of goods that he was selling in the
usual course of business, he had made secret transfers of the
same by mortgages that were not filed, but which were fraudu-
lently concealed; that subsequently he made other secret
transfers and fraudulently concealed them from the plaintiff;
that he was insolvent and knew it when he purchased the
property in question and fraudulently concealed the fact from
her; that he purchased and received the goods with the pre-
conceived design not to pay for them; that as fast as the car-

riages were received he transferred the most of them to secure precedent debts, requesting that the transfers be kept secret, and that he knew he could not continue in business or pay for the property. He refused to find, upon defendant's request, that the plaintiff did not rely upon the representations in selling the property in question and he is presumed, in support of his other findings, to have found the converse of that proposition, and that the sales in the fall were induced by the representations in the spring. (*Gardiner* v. *Schwab*, 110 N. Y. 650.)

It seems to me that the weight of evidence supports the findings of the referee and demonstrates that Folsom was guilty of fraud by false representation, as well as by fraudulent concealment. Even if the false representations did not induce the credit, they have a material bearing upon the intent of the purchaser. Where a man purchases goods on credit when he is insolvent and knows it, very little further evidence is needed to establish fraud and the intentional misrepresentation is ample for that purpose. Mortgaging the property so promptly after its purchase and stripping himself of all means of making any payment or continuing in business, except by the forbearance of his mortgage creditors, is also sufficient. The simple request not to file the mortgages is of great significance, under the circumstances, for this man, apparently doing a prosperous business and in the possession of a large amount of property, knew that he would be compelled to fail if those liens were filed. The fact that all of the mortgages for year after year were kept from the files, a part of them at least through his agency, threw the burden upon the defendant of proving that the non-filing of the remainder was not owing to him. While concealment by mere silence may not be enough, add to it the effort to divert suspicion and prevent inquiry by a system of concealment and it is enough. Simple silence ordinarily has the protection of the law, but an active effort to suppress the truth should receive the condemnation of the law. This is not a case of accidental or careless omission to make disclosures required by the plain rules of common

honesty, but a course of deceptive conduct, preceded by deliberate misrepresentation.

Folsom knew when he bought the goods that he was on the verge of financial disaster and that his failure could be caused at any time by the lawful, and even probable action of persons over whom he had no control. The discrepancy between his assets and liabilities was so great that he had no reason to believe that he could retrieve his affairs and he had no right to make his creditors take the risk of a hopeless effort in that direction. While, owing to his popularity and official position he may have thought that he *might* be able to pay for these goods, he had no reasonable expectation that he could do so, unless it was by shifting the debt upon the shoulders of others by "borrowing of Peter to pay Paul," which would not do away with the furtive intent.

It is well established that either *suggestio falsi* or *suppresio veri* is sufficient to establish fraud. Here we have both. Folsom took advantage of the plaintiff's confidence in his financial ability, induced by wilful concealment and false statements on his part, and was thus guilty of actionable fraud, that vitiated his title to the goods in question. As the defendant was not a *bona fide* purchaser, it took no better title than he had and hence the plaintiff had the right to rescind the contract and reclaim her own.

For these reasons I am compelled to dissent from the judgment of my associates, which I regard as establishing an unfortunate precedent, that will long be relied upon by the dishonest and fraudulent to justify acts opposed to commercial integrity.

All concur with BROWN, J., except VANN, J., dissenting.

Order affirmed and judgment absolute for defendant on stipulation.