FARMERS' SAVINGS BANK, Appellee, v. W. R. JAMESON, Appellant.

**GUARANTY:** Construction—Unlimited Guaranty—Rule of Reason.
1  A *general* guaranty of the solvency of a proposed borrower, *unlimited* both as to time and amount, may not be construed and acted upon by the guarantee to an extent which the guarantor did not and could not, in reason, intend or anticipate.

**FRAUD:** Fraudulent Representations—Justifiable Construction of
2  Language. One may not rely and act on the language of a false representation, however vicious, beyond that meaning which has been placed on such language by (a) the approved usage of the language, (b) the meaning in law that a technical phrase may have attained, or (c) the law of the land.

**BANKS AND BANKING:** Loans—False Representation as to Solvency—Implied Limitation on Language. A false representation
3

to a bank that a proposed borrower "was good for *any* arrangement" which the bank might make with him, impliedly means "any arrangement *not repugnant to sound and safe banking.*"

**BANKS AND BANKING:   Loans—Guaranty or False Representa-**
4   **tions as to Solvency of Borrower—Effect of Statute.** A guaranty to a bank of the solvency of a proposed borrower, or even an intentionally false representation as to the solvency of such borrower, to the effect that such borrower is "good for *any* arrangement" which the bank may make with him, is necessarily limited by the statute law of the state (Sec. 1870, Code Supp., 1913) as to what "arrangements" are permissible on the part of the bank with such borrower. Such guaranty or representation cannot be construed as authorizing or justifying the bank in violating law.

**CRIMINAL LAW:   Misdemeanor—Prohibited Act Without Penalty.**
5   Whether the making of loans by state banks to single borrowers in excess of 20 per cent. of the bank's actually paid-up capital, in violation of Section 1870, Code Supp., 1913, is a misdemeanor, under Section 4905, Code, 1897, *quaere.*

**FRAUD:   Fraudulent Representations—Justifiable Reliance—State**
6   **Bank Loans.** One who fraudulently represents to a state bank that a proposed borrower is "good for *any* arrangement" which the bank may make with him is liable only for such loan as the bank may *legally* make to such borrower, to wit, a loan not exceeding 20 per cent. of its "actually paid-up capital." (Sec. 1870, Code Supp., 1913). And this is true even though such borrower could not, by reason of a violation of such law, defeat the collection from him of the loan, and even though the violation of law be conceded not to be a crime on the part of the bank.

DEEMER and PRESTON, JJ., dissent.

**CONTRACTS:   Construction—Avoiding Literal Terms of Writing.**
7   The literal words of a writing are not to be so strained as to justify the doing of improper and unsafe things which are condemned and forbidden by law, or the commission of a breach of trust.

PRINCIPLE APPLIED: Plaintiff was a state bank with a paid-up capital of $10,000. Section 1870, Code Supp., 1913, commanded that the total liability to the bank of any borrower of money should not, at any one time, exceed 20 per cent. of the paid-up capital; in other words, in this instance, $2,000. Plaintiff received from defendant a letter, in which defendant stated that a proposed borrower was *"good for any arrangement"* which the bank might make with him. Plaintiff relied thereon, and loaned to said borrower until the liability of said borrower exceeded

$60,000, and he was wholly unable to pay. Plaintiff claimed that the said representation as to the borrower was intentionally false. *Held*, the defendant could under no circumstances be held liable in a sum in excess of $2,000, irrespective of the literal language of the representation.

**FRAUD:** Fraudulent Representations—Damages—Payments—Application—Suretyship. Where a fraudulent representation to a bank as to the solvency of a proposed borrower was relied on by the bank by making loans far in excess of that which was justified by the representation, and the borrower *repaid* the bank an amount in excess of what the bank was justified in loaning on the representation, such repayment worked an entire discharge of the liability of the one making the representation.

DEEMER and PRESTON, JJ., dissent.

**FRAUD:** Fraudulent Representations—Evidence—Insufficiency. Record reviewed, and held insufficient to establish the making of any *fraudulent* representation to a bank as to the solvency of a proposed borrower.

DEEMER and PRESTON, JJ., dissent.

*Appeal from Blackhawk District Court.*—CHAS. W. MULLAN, Judge.

MONDAY, APRIL 10, 1916.

ACTION at law to recover damages for fraud and deceit accomplished by means of a letter written by defendant to plaintiff, which is alleged to have induced plaintiff to loan a large sum of money to the Central Iowa Granite Company. Verdict and judgment for plaintiff in the sum of $40,000. Defendant appeals.—*Reversed.*

*Edwards, Longley, Ransier & Smith,* and *J. W. Arbuckle,* for appellant.

*Williamson & Willoughby,* and *Mears & Lovejoy,* for appellee.

SALINGER, J.—I. Defendant wrote plaintiff a letter, in

effect, that its bearer was a desirable bank customer, would
probably need to use considerable money, was thoroughly reli-
able, and was "good for any arrangement" it
might make with plaintiff. Plaintiff was a
bank, which was forbidden by Section 1870
of the Code Supplement, 1913, to loan more
than $2,000 to any one borrower; but, from time to time after
receiving this letter, it loaned the party so presented more
than $60,000, and the borrower is wholly unable to pay. The
bank contends that it would not have loaned at all had it not
been for said letter, and was induced thereby to loan said
large sum. It had a verdict against defendant for its said
loss. The trial judge charged that the statement as to being
good, etc., is "the material part of this letter," and, if the
damage suffered by plaintiff by the said loaning was "the
immediate consequence" of relying thereon, defendant will
not be relieved from liability, though the loan "was in viola-
tion of law and in sums beyond the authority of the bank to
make." Appellant urges that this charge is erroneous, in
that it permits a recovery for the total of the loans; because,
in no view, was defendant liable for more than the $2,000
which might lawfully have been loaned; that any loan above
$2,000 could not be *any* "consequence" of the letter and,
therefore, no "immediate consequence" of the same. This
attack presents whether the law has put any limitations on
what should be understood from the phrase "good for any
arrangement" a proposing borrower might make. If, for
illustration, said letter is to be treated as a general guaranty,
unlimited both as to time and amount, then, though its maker
undertook "to become responsible for any amount of credit
you may give him," he would still not be bound for "an
unreasonable amount of credit." *Lehigh Coal & Iron Co. v.
Scallen* (Minn.), 63 N. W. 245. If we may treat this letter
as being no more than such guaranty, we would readily hold
that the loaning of more than $60,000 to a stranger, a country

1. GUARANTY:
construction:
unlimited guar-
anty: rule of
reason.

dealer in gravestones, made by a bank having a capital of $10,000, and limited by statute to $2,000 per borrower, was so unreasonable a credit as that the guarantor could not be charged with it, because he neither intended nor anticipated it. It is manifest, then, that, if we may not thus hold, it is because the finding of the jury settles that the letter was a fraudulent false pretense, and that, therefore, the writing of it was not a guaranty, but a tort.

One difference between a letter of guaranty and a letter which is a tort is that one who so commits a tort may not defend that his writing had unexpected consequences. *Doyle v. Chicago, St. P. & K. C. R. Co.*, 77 Iowa, at

2. FRAUD: fraudulent representations: justifiable construction of language.

610; *Texas & P. R. Co. v. Carlin*, 111 Fed., at 778; *Fottler v. Moseley* (Mass.), 70 N. E. 1040; *Hill v. Winsor*, 118 Mass. 251; *Jones v. Boyce*, 1 Star. N. P. 493. And the essence of appellee's theory is that, because of this rule of damages in tort, defendant may not urge that he could not anticipate that $60,000 would be loaned on the strength of the fraudulent pretense with which he is charged. It is perfectly true that he may not do this if the pretense was broad enough. But does the fact that it will not avail one who *does* make a false pretense to say that he could not reasonably anticipate the consequences that *did* follow, make him liable for a pretense which he did not make? That one who utters a false pretense may not escape the consequences of it, no matter what they are, certainly has no bearing on the question of what his false pretense was, nor bar the defense that the loss sustained is not a consequence of his writing at all. The existence of said rule of damages merely enlarges what may be recovered for a wrong which *has* been committed. The least reflection should demonstrate that the rule does no more than settle that, in cases where a charged representation is established, the defense that its consequences were unforeseen, or could not have been foreseen, is eliminated. But, surely, such rule does

not interfere with showing that no false pretense was made, or that what was suffered by complainant was not caused by such false pretense as was made. That a stated act's being done precludes inquiry into whether its consequences could be anticipated neither proves that such act was committed, that it had any consequences, nor what were its consequences. Once show that this defendant did fraudulently write a falsehood which may in reason have been understood to represent that the Granite Company was financially responsible for any amount whatsoever, and he may not say that he should not have been believed, nor that he could not foresee that so large a loan as was, would be, made. But, if he made a representation which could not thus be understood, then, no matter how fraudulent was his letter, its representations would still be no more than they were. A fraudulent representation that one is good for $2,000 would not make him liable for all loaned if $60,000 be loaned. While the representor may not say that, though he falsely represented that a borrower was good for $2,000, he did not anticipate that such sum would be loaned, he may defend against being held liable for a $60,000 loan, not because the larger loan could not have been anticipated, but because he never represented the borrower to be good for the larger loan. The falsity of the pretense that the borrower is good for the smaller sum, coupled with the fact that the larger sum was loaned, cannot enlarge the pretense that was in fact made. The excess of the loan above $2,000 is not an *unexpected consequence* of the pretense which was made, but it is not its consequence at all. If we must hold that the representation made was limited to a loan of $2,000, then, as to the loan in excess thereof, there is no question of fact as to whether the larger loan was proximately due to such representation. Our question is not whether defendant made a false representation not limited to a loan of $2,000, and whether he may evade it by claiming that he could not foresee that $60,000 would be loaned. It is whether a loss suf-

fered by plaintiff was caused by justified reliance upon the representation which *was* made. No matter how vicious the fraud perpetrated, plaintiff may not recover more than such fraud induced him to lose; and Instruction 12 so rules. It follows, the vital inquiry is, what is the representation that was made,—more concretely, how should plaintiff have, as a matter of law, understood what was written to him? However the damages permissible may differ in tort and on guaranty, what language used means, is settled by the same rules in either case. While one may not commit a tort by writing and have read into it a limitation as to what damages resulting he is to be responsible for, he may insist that what he has written is not the tort which plaintiff claims it to be. There is no rule of construction peculiar to determining the meaning of written words which constitute a tort. The same words are dealt with in the same way, whether found in a statute, an alleged libel, or a contract. We have applied the ordinary rules of construction in tort, or, rather, in determining how a statute forbidding a tort should be construed. *State v. Gardner,* 174 Iowa 748, involves how the words "any person" should be construed when found in a statute which makes it a felony to resort to a house of ill fame, for stated purposes. It goes without saying that the felony of so resorting to such house is as much a tort as the writing of a fraudulent false pretense. We held, in *Gardner's* case, that the phrase "any person," found in such statutes, though broad enough to include all human beings, is limited by the rule of reason; and that, in determining how the use of words was understood, there should be taken into consideration what was the general understanding of the law as it existed before such statute was made, in order to arrive at what meaning such words in such statute would convey; and that it should not be held that the legislature contemplated absurd literal interpretation of said general words. If the approved usage of the language, or the meaning in law of a technical phrase or pre-

existing law, may be read into a statute which creates a felony, and if the words therein found may be interpreted and limited by considering these, it must follow that, whenever it becomes a question whether a written false pretense induced a loss, the rule of damages in tort affords no reason for blocking an inquiry on what the words used in the pretense mean, in law. Dealing with "any person," when defining to whom a criminal statute applies, and "any consequence," used in a false pretense, calls not for different rules of construction. Though the consequence of what was written must be met, whether anticipated or no, no rule of law prevents reading into a written false pretense either the approved usage of the language, the meaning in law that a technical phrase may have attained, or the law of the land. The point, then, narrows to how, applying the ordinary rules of construction, plaintiff must have understood defendant's letter.

## 2.

If, to the statement that the proposed customer "was good for any arrangement he might make," there had been added, "but not exceeding the borrowing of $2,000," it will be agreed that, though the rating as worthy a credit of $2,000 were a deliberate fraud, defendant would not be liable for $60,000 loaned in addition to $2,000. If, for any reason, plaintiff must have understood the unlimited statement to be limited to a credit of $2,000, then the case stands as though the supposed limitation had been written into the letter. If, for any reason, plaintiff must have understood that, when defendant wrote that the company was good for "any" arrangement it might make, he meant to convey that "any" such arrangement meant one that was not repugnant to sound and safe banking, then the letter to plaintiff is to be treated as though it stated such proviso. If, by

3. BANKS AND BANKING: loans: false representation as to solvency: implied limitation on language.

general banking usage, known to both the banker who wrote and the banker who received the letter, the phrase, "good for any arrangement to borrow" meant an arrangement sanctioned by good banking, then, no matter how fraudulent, the representation made to plaintiff was still not one that the company was good for "any" loan it might be willing to take, but good for one not in excess of the limit set by sound and safe banking. If the broad words used had become thus limited by "context and the approved usage of the language," or because they constitute a technical phrase which was thus limited by having acquired "a peculiar meaning in law," then the broadly worded representation carried on its face a restriction to whatever was sound and safe banking. We have already pointed out that the word "any" does often have a meaning narrower than the literal; that it is never to be taken literally at the expense of reason. Should it here be given its broadest meaning? The parties sustained no fiduciary relations,—indeed, no relations. Yet the letter was signed by a bank president, and we must assume for plaintiff that it believed his letter to be an honest one. Still, it was, after all, the letter of a stranger. The record discloses no knowledge of or about him beyond that the recipient recognized him as the one who presided at a bankers' meeting at Vinton. Every mental step which overcame that fact, by giving weight to the standing of one who was such bank officer, involved thinking that such an one writing to a brother banker in honesty would not request what it would be unreasonable, in fact, for a stranger to do, and unreasonable for him to think or believe a stranger would do—involved the thought that he would not ask the making of loans that one of his standing would not make. Whatever led plaintiff to act out of deference to the writer threw light on the meaning of his letter. Its recipient could not conclude that it was safe to loan because an eminent, honorable, financial authority represented it to be proper, and believe, too, that such authority was requesting it to loan

all its funds, and more than six times its capital, to a non-resident country monument dealer, of whose affairs it knew nothing, without bankable and adequate security. Applying the elementary canons of construction to such situation and conditions, constrains us to hold that the representations made, honest or no, could not, in reason, have been understood to be that the company was, literally, good for any sum whatsoever, and must have been understood to speak to nothing above any loan which a bank of the class to which plaintiff belonged, would, in reason, be likely to make to such a borrower, or any borrower, in the circumstances—a loan that was proper banking.

3.

Now, ordinarily, what was such a loan would be a jury question. But is that so if the law defines what is such banking—if it be settled, as matter of law, that loaning more than $2,000 is unsafe, discredited, and, therefore, prohibited banking; if, in a word, statute law may be read into the letter? All who do business in the state are conclusively held to know its law. It is not strained to assume that both parties, bankers, actually knew the statute law on banking. In our view, such law does declare that a loan, here, of more than $2,000 was unsafe and discredited banking, and forbids it.

**4. BANKS AND BANKING: loans: guaranty or false representations as to solvency of borrower: effect of statute.**

Section 1870 of the Code Supplement, 1913, prohibits this plaintiff bank to permit one borrower to become liable to it beyond $2,000. Section 1877, Code, 1897, makes it the duty of, or at least empowers, certain officers to wind up the affairs of a bank which violates Section 1870, with a receivership. It is a question whether a violation of 1870 is not within Section 4905, Code, 1897, which provides that, when

**5. CRIMINAL LAW: misdemeanor: prohibited act without penalty.**

the performance of any act is prohibited by any statute, and no penalty is imposed, the doing of such act is a misdemeanor.

Whether it is, needs, for reasons presently to be stated, not to be decided; and we may assume, for the purposes of this decision, that no punishment is provided for those who disobey Section 1870. It is true, too, but we think

6. FRAUD: fraudulent representations; justifiable reliance: state bank loans.

not material, that the one who borrows more than such statutes permit may not resist judgment by pleading the violation of such statute. 5 Cyc., page 580, Note 95; *Portland Bank v. Scott* (Ore.), 26 Pac. 276; *Wyman v. Citizens' Nat. Bank,* 29 Fed. 734; *O'Hare v. National Bank,* 77 Penn. St., at 102; *Gold-Mining Co. v. National Bank,* 96 U. S., at 641; *Mills County Nat. Bank v. Perry,* 72 Iowa, at 16; *Weber v. Spokane Nat. Bank,* 64 Fed., at 211; *Savings Bank v. Boddicker,* 105 Iowa, at 558. These but declare that the statute rule is for the safety of the bank and its stockholders and creditors; that to prevent recovery of the borrower would, therefore, injure those whose protection is the object of the statute; and that one who keeps what he got by having the statute violated should not be heard to object to payment because what he received was got in spite of the statute prohibition. And the *Boddicker* case, *supra,* so holds as to the surety of the borrower. As put in *Gold-Mining Co. v. National Bank, supra,* "after obtaining and holding to its own use the money," the company cannot be allowed to interpose the plea that the bank had no right to loan the money. And see *Portland Bank* case, *supra.* It is true, as well, though again immaterial, that recovery is allowed because it is for the government and not the borrower to punish for the disobedience of such statutes. *O'Hare v. Bank,* 77 Penn. St., at 102; 5 Cyc., page 580, Note 95; *Wyman v. Bank,* 29 Fed. 734.

How does all this matter? True, the borrower here could not defeat judgment; true, it is not permitted to punish the lender. But the controversy is not over whether one who got

and retains the proceeds of a prohibited loan is estopped to urge the violation of the law committed in loaning to him, nor over whether the lender may be punished, and, if so, how and by whom, but over whether a recommendation should have been understood to be limited to loans that did not constitute bad and prohibited banking, as defined by statute.

It is possibly to be gathered that there is suggested that, since the borrower may not avoid the contract, a stranger may not. It misses the point. This defendant *is* a stranger to the borrowing and lending. He is not liable as a *borrower* at all, not even up to $2,000. He has no need to and could not urge that part or all of the loan is uncollectible because of said statute prohibition or rule. But all this does not establish that he may not say that his letter did not advise a disregard of said statute, limited the plaintiff to loans not within its condemnation, and suggested the limitations of this statute. That the borrower is estopped, and that the lender may not be punished, in no way meets the statement of *Fowler v. Scully,* 72 Pa. 456, noted in *O'Hare's* case, *supra,* that the statute is a regulation "to prevent these associations from splitting on the rock which has ruined so many banks, to wit, that of lending too much of their capital to one person or firm, the intention being to protect the association and its stockholders and creditors from unwise banking, we cannot suppose it was meant to injure them by forbidding recovery of the injudicious loans." It in no way establishes that plaintiff was justified in understanding the letter to advise the making of a prohibited loan which, as a matter of law, was unwise banking. It is not to be assumed that the recipient of the letter said to himself that, though to loan these parties six times the capital and substantially all the money of the depositors is unsound banking and is prohibited by law, this letter advises doing this, and should be followed, because so loaning, while it may close the bank and ruin its owners

7. CONTRACTS:
construction:
avoiding literal
terms of writing.

and creditors, will not send the lender to jail, and because the stranger borrower will not be able to prevent the getting judgment against him. General language should not be construed to authorize any and all acts upon which the criminal law has not laid its ban, and for consequences of which the courts will afford some remedy.

We have gone so far as to hold that a statute which is void may still fix public policy. Mr. Justice Deemer, speaking for the court, said, in *Dorn v. Cooper*, 139 Iowa, at 750:

"The legislature, in declaring the public policy of the state, had spoken in an authoritative way, and, although the statutes may have been void, because not uniform in their operation, or because of the varying degrees of punishment, the acts with which plaintiffs were charged were none the less contrary to public policy of the state, as declared by proper legislative authority."

If one receive a letter requesting that the recipient do "anything" in his power for a third person, it should not be construed to include lying for him, or inducing the widowed sister of recipient to embark every dollar she has in some utterly reckless speculation proposed by the other. And this is so though lying is ordinarily not punishable by fine or imprisonment, though such advice be not punishable, and though the widow is saved the right to get a worthless judgment as a substitute for all her means of livelihood. It reverts to the undeniable proposition that words are not to be strained into a request to do improper, unsafe things condemned by law, or to commit a breach of trust against depositors, merely because what is done is not a criminal offense, and because, for reasons of public policy, the courts will entertain attempts to remedy such misdoing.

The result is that, even in tort, defendant can be put in no different position than he would occupy had his representation been in terms limited to a credit not exceeding $2,000. It follows that he is not liable for the loss of plaintiff by loan-

ing more than that. It remains but to determine whether he is, in any view, bound to repay up to $2,000.

II. Without determining what it was, in fact, that induced the plaintiff to part with any money, the utmost that may be claimed for plaintiff on this record is that a false representation concerning the solvency of a borrower induced it to loan $2,000, to its loss in that amount. It appears that the borrower repaid more than that sum. If, after parting with $2,000 because of a wrong done by defendant, plaintiff had compelled the borrower to repay that sum, it would be clear that, no matter what the wrong of defendant, he would be absolved from liability, for the simple reason that his wrong had ceased to be injurious. Now how is this changed because a borrower who had fraudulently obtained $2,000 by the help of defendant, and, say, $18,000 more through an act of plaintiff, not induced by defendant, pays back, say, $10,000? In a sense, defendant is a surety for $2,000. It is in the sense that, of a larger aggregate of loans lost, he is holden to save the lender harmless for but $2,000, and may urge that the applying of $10,000 received on what he is not liable for at all is to give undue preference to the plaintiff whose act caused the loss *above* $2,000 as much as defendant's caused the loss *up to* $2,000. We think that, in these circumstances, defendant may insist that, when the fraudulent borrower restores more than $2,000 in reduction of a loss greater than $2,000, the sum received should be applied as far as necessary to extinguish defendant's liability for the loss of the smaller sum, and should not be devoted by plaintiff to the payment of the loss above $2,000, which, so far as defendant is concerned, would never have happened but for the act of plaintiff. Some such thought as this rules *Savings Bank v. Seidensticker*, 128 Iowa 54, 55, as to the surety of an embezzler; and *Crane Co. v. Heat & Power Co.* (Wash.), 78 Pac. 460, lends considerable support to this position.

8. FRAUD: fraudulent representations: damages: payments: application: suretyship.

**2.**

If there be doubt as to this, there is another reason why defendant should not be held responsible in any sum. We have examined this record with the care due the gravity of the issues, and are satisfied by such investigation that there is no sufficient, if indeed any, evidence that any representation made by defendant was fraudulently made. And our passing upon this point is, notwithstanding the disposition of the case, no mere dictum. The lack of proof is duly presented. A finding of no fraud is at least an alternative finding. It furnishes a reason why the decision is right, even if the arguments that no representation was made and that liability has been extinguished be not tenable. If, in passing on the alleged fraud, we may be said in any sense to depart from the rule of "needless decision," we think there is a peculiar situation which justifies, if, indeed, it does not demand, a seeming departure from that rule. There is in the record a verdict and a judgment which find the defendant guilty of an intent to defraud. A reversal on the ground that no representations were made concerning the right to credit above $2,000, and of repayment by the borrower, does not exclude that defendant fraudulently represented the Granite Company to be good for as much as $2,000. Finding that the evidence does not disclose any fraud, we think we should so declare, because our ultimate conclusion obviates a retrial, and thereby all opportunity for defendant to set aside the now existing finding of fraud below, on a retrial.

III. Various other contentions are fully argued. Among them are: (1) Whether, under the pleadings, it was error to permit a recovery if it be found defendant had asserted positively, and of his own knowledge, that something was true, though he did not know whether it was true or false; (2) whether the letter should not have been understood to refer to the buying of commercial paper rather than to the loaning

*9. FRAUD: fraudulent representations: evidence: insufficiency.*

of money; (3) whether the statement as to financial standing was more than a naked opinion; (4) whether a recovery may rest upon failure to advise plaintiff if defendant learned, after writing, that the company was or had become insolvent; (5) whether plaintiff in fact relied upon the letter, and, if so, whether the case be not within the ancient rule which denied recovery as for fraud to one who was not "an innocent;" (6) whether insolvency may be shown by opinion testimony; (7) whether insolvency may be established by showing that one is generally reputed to be insolvent, and, if so, whether such general repute in his community is any evidence that one who lived there and asserts him to be solvent is responsible as for asserting that which he knew to be false.

Having concluded that defendant never made a representation that the Granite Company was good for more than $2,000, and that any loss sustained up to that sum has been repaid, and, if this be not so, yet no fraud induced any loss sustained, it becomes apparent we should not pass upon the various other error points made.

The case must be, and is—*Reversed.*

EVANS, C. J., LADD, WEAVER and GAYNOR, JJ., concur.

DEEMER, J. (specially concurring)—While agreeing to a reversal of the case, I dissent from the ground thereof, and from the legal conclusion announced in the opinion. I especially dissent from the finding that there was not sufficient evidence of fraud and false representations to take the case to a jury. I disagree with the conclusion that, even if there be fraud and actionable misrepresentations, no recovery can be had, because of payments which should be credited to the account, and especially disagree with the rule of damages announced in this tort action for deceit.

The first is a question of fact, and the other two propositions, questions of law.

I. Upon the first proposition, I think the question was one for a jury, and that we are usurping its functions in saying that there is not sufficient testimony of fraud. The case, as I understand it, is this: Plaintiff is a state savings bank, doing business at the town of Morrison, in Grundy County, Iowa; and the defendant was the president of the Citizens' Savings Bank of Waterloo, Iowa. E. A. Boggs and L. D. McCloud organized what was known as the Central Iowa Granite Co., which was simply a trade or partnership name, for the handling of granite and other monuments, with its principal place of business at Waterloo; although it did business in ten or twelve counties adjacent to Black Hawk, and considerable in Grundy County. McCloud was the active manager in the business until about April 1, 1910, when Boggs also became active in it, and he (McCloud) continued his con-nection with it until January, 1911, when he retired. After April 1, 1910, and until the failure of the company, in January, 1912, Boggs was an active, and for the last year the sole, manager of the company. In the year 1910, the company did a $20,000 business, and in the year 1911, its business amounted to approximately $40,000. It failed in January, 1912, and at that time, owed approximately $120,000 more than its total assets. On April 1, 1910, the liabilities of the company were from $50,000 to $60,000, and, by July of the same year, they had increased to close to $75,000.

Boggs now claims that he did not discover the condition of affairs until some time after he had taken exclusive charge of the business. McCloud was the practical man of the firm and did practically all the business, until Boggs severed his connection with other enterprises and devoted his exclusive time to the business, about April 1, 1910. The firm was doing business with a number of banks in the territory of its operations, among them being the Citizens' Savings Bank and three others in the city of Waterloo. Desirous of obtaining credit with plaintiff bank, Boggs procured from defendant the following letter:

"CITIZENS SAVINGS BANK
"Waterloo, 'Iowa, June 29, 1910.
"W. R. Jameson, Pres.          F. C. Braniger, Cashier.
"F. F. McElhinney, Vice-Pres.    A. E. Smith, Asst. Cashier.

"Mr. E. H. Reimer, Cashier,
    "Farmers Savings Bank,
        "Morrison, Iowa.
"Dear Sir:
    "The Central Iowa Granite Company is doing a large business in your territory and have very good paper to handle from time to time. They are good customers of this bank and I have suggested to Mr. Boggs that whatever business they have there be done at your bank. They are thoroughly reliable and good for any arrangements they may make with you. Just now they are buying up a large supply of monuments for their fall business and, of course, use considerable money. Their business is very large and this stock is rapidly turned into money again.
    "Any favors you may show Mr. Boggs will be appreciated by me and I shall be glad to turn you any favors I can.
                "Yours truly,
                "W. R. Jameson, President."

    Boggs took this with him to the cashier, to whom it was addressed, and made application for a loan, and also arranged to negotiate the company's contracts for monuments with plaintiff's bank, and to handle a part of its business. Plaintiff contends, and offered testimony to show, that all its subsequent dealings with the Granite Company and with Boggs were had on the strength of this letter, unless it be a loan of $500 negotiated on June 28, 1910, on the strength of another letter, which is not in the record. Collateral contracts were deposited as security for this loan. On the strength of the letter above set out, plaintiff loaned to Boggs and his firm $1,000 on June 29th, and soon thereafter, more loans were made, and from

that time on, during the balance of the year, loans were very frequent, and money was advanced to the firm and to Boggs at intervals during the next year; so that, on March 1, 1911, the indebtedness to the bank amounted to $52,000, and in September of the same year, it had increased to $62,000.

Plaintiff's cashier testified:

"At the time I received the letter Exhibit 'A', I had no personal knowledge of the affairs of the Central Iowa Granite Co. or E. A. Boggs or L. D. McCloud. I recognized the signer of the letter as being the gentleman who presided at the bankers' meeting at Vinton. I read the letter, believed the statements in it to be true, and relied upon the truth of the statements in loaning Mr. Boggs and the Central Iowa Granite Co. this money. I was induced as cashier of the bank to let Mr. Boggs have the money on account of being highly recommended by Mr. Jameson. I took it for granted that the company, no doubt, was as represented and would meet their obligations as has been stated. Mr. McCloud, the other partner, never came to our bank for the purpose of borrowing money. It was all given to Mr. Boggs. The monument contracts left there were endorsed by the Central Iowa Granite Co., by E. A. Boggs, President. The aggregate of all these contracts that were in the bank in September, 1911, was about $12,000. There were times during this period when he got money there without leaving contracts. I surely would not have loaned this money of the bank to Boggs or to the Central Iowa Granite Co. had it not been for the statements in this letter. There was a meeting of the directors of the bank in March, 1911, and on that occasion the amount of the indebtedness was ascertained. The directors gave me instructions not to let Boggs have any more money. Q. Do you know about or approximately what quantities of money if any you let Boggs have after that time? A. It was something like ten thousand dollars. Q. How did you come to do that? (Objected to as immaterial. Overruled. Defendant excepts.) A. Well, Boggs stated to me that he had vast quantities of

granite on the track in Waterloo and in transit, and if I could furnish the money so that he could release that immediately, why he would be able to get back larger quantities of money than he would get at that time. In fact, a good many of those shipments which he claimed he was getting, contained some of the monuments for which we held contracts. He got money after this time in March on several occasions."

The capital of the plaintiff bank was $10,000, and the loans made to Boggs and his concern were grossly in excess of the amount authorized by law. Section 1870 of the Code Supp., 1913, provides that such loans shall at no time exceed 20 per cent of the actually paid-up capital stock of the bank. But the same statute provides that the discount of commercial business paper actually owned by the person or firm negotiating the same shall not be considered money so borrowed. The nature of the transactions with the bank was thus explained by one of the witnesses:

"The first time I ever saw Boggs was on June 28, 1910, and on that occasion I loaned him $500. He had some contracts with him at that time, maybe with people who lived somewhere through the country, for the erection of monuments by Mr. Boggs' company and provided for payment of a certain sum for the monuments when erected. Mr. Boggs left some of these contracts with me on the first day as security when he borrowed the $500. That is what I relied on when I let him have the $500. When he came back the next day, he assigned as collateral security for the $1,000 he borrowed at that time, a contract of just about that amount. He came at different times after that with contracts of a similar nature. He had notes at various times which he had taken for monuments which his customers had given when he set the monuments and made settlement,—and came and discounted those notes at the bank. On the 28th or 29th of June when he was there, he explained to me his method of obtaining these contracts and how he was doing business, that these contracts were obtained and the money on the contracts was not to be

paid until the monuments were set up. These contracts were assigned over to the bank as collateral security for the money he was getting. Sometimes there was money obtained at the bank when there was no collateral security left at all, and I had an understanding with Boggs that all the collaterals he left there should be held for any money that he might borrow or any indebtedness to the bank, so that I relied upon this security for any debts, whether he happened to bring the contracts at the time I gave him the money or not, and relied upon all the contracts as collateral. Some of the contracts and notes discounted which he brought there were against people in that vicinity, and where they were not in that vicinity, I made no inquiry as to their responsibility. Quite a number of these notes which he discounted in the bank were notes that he gave himself that were paid from time to time. He gave notes of his own or of his granite company, and when they became due might pay them or renew them—went through the usual form of bank's business with a customer, discounting his paper, borrowed money and paid money from time to time, extending for a year or a year and a half. Some of these contracts that he left with me as collateral security for his liabilities to the bank were taken up and paid from time to time. On some of them, Mr. Boggs collected the money and sent it to me. I do not know the aggregate of the payments of money for contracts turned in at different times, but whatever they amounted to, Boggs and the Granite Company were given credit for them, so that none of these payments entered into the aggregate sums I have named that remained unpaid when he left the bank; and, after allowing him credit for all the payments that were made, there still remain the amounts that I have named as the aggregate of his indebtedness.''

Boggs himself testified:

''Commencing with June 28th, 1910, I did a good deal of business with the Farmers' Savings Bank at Morrison. That business consisted in borrowing money. A number of contracts were left there. My arrangement was that I was to

have the entire charge of these contracts in the way of collecting them, and they went into our general fund and the discounts were made on the face of the notes and payments were made on the notes themselves. The notes I gave there were discounted from 16 to 80 per cent. The average rate of discount was not far from 16 to 20 per cent. Possibly but two short time notes were discounted as high as 80, late in the period. Those discounts went right into the obligation, taken out in advance and became a part of the notes. That is, supposing a note was given for $2,500, I did not receive $2,500 in cash. The amount of the discount was deducted from the face of the note and I was given the difference. The note was made to cover the actual cash advanced and the discount, so that the obligation to the Farmers Savings Bank included those high discounts and constituted a part of our liability there. We continued to do business with the Farmers' Savings Bank of Morrison, borrowing money, paying notes, receiving contracts, etc., until about the 1st of January, 1912. I think we had no loans from the bank after the 1st of September, 1911. We did make payments during the fall of 1911, up until the close of January, 1912.''

The statements by Boggs as to the discounts exacted by plaintiff bank are denied by the officers of the bank, who testified that no such were had, and the jury had the right to accept their testimony to the effect that the discounts did not exceed the usual rates.

As a matter of fact, McCloud and Boggs were practically insolvent at the time all these loans were made, and the liabilities of the firm were considerably in excess of its assets; but Boggs had faith that he could pull the business through when he took the active management thereof, and proceeded to act on that assumption, with the not unusual result. When the concern failed, sometime in January of the year 1912, and it became apparent that plaintiff would lose the money unless it could hold the defendant responsible on his letter before quoted, this action was commenced.

The petition is not bottomed on the thought that the defendant's letter is one of credit, or that it constitutes a guaranty, but proceeds upon the theory that the defendant was guilty of fraud and deceit, and that plaintiff suffered damage therefrom to the amount of money loaned to Boggs and his company, which was not recoverable from either; and it was on this issue that the case was tried. The defendant introduced no testimony, and the facts are not seriously in dispute; but the parties differ as to some of the inferences to be derived therefrom. As the verdict was in plaintiff's favor, he is entitled to the benefit of the strongest inference in his favor which may reasonably be drawn from the testimony adduced.

The facts necessary to be shown to justify a recovery for fraud and deceit are well known, and generally understood. It is incumbent on plaintiff to show: First, that the defendant made the representations charged, and that they were representations of fact, as distinguished from mere opinions; second, that such statements were false in fact, and that defendant knew them to be false, or that they were made as of his own personal knowledge, whereas, he in fact had no knowledge of the truth thereof, or that he had the means at hand of knowing of their falsity; third, that the representations were made with intent to deceive the party to whom made; fourth, that the party to whom made did not know of their falsity, but, believing the same to be true, relied and acted thereon; and, fifth, that he was damaged thereby.

The trial court instructed upon the first proposition as follows:

"The material part of this letter, and the one to which your attention is particularly directed, is the third representation above set out; that is, that the Central Iowa Granite Co. and E. A. Boggs were, at the time of the writing of the letter, thoroughly reliable, and good for any arrangements which they might make with the bank. As to the construction which should be given the language of the defendant in making such

representation, you are instructed that such representation so made by the defendant was a representation by him that the Central Iowa Granite Company and Mr. Boggs were financially thoroughly reliable, and that they were able financially to meet and pay any obligation which they might enter into with the Farmers' Savings Bank, in carrying on and transacting the business of the Central Iowa Granite Co.''

This instruction is challenged; and in the same connection it is argued that defendant's motion for a directed verdict, filed at the close of plaintiff's testimony, should have been sustained, for the reason that none of the statements made in the letter are of facts, but, at most, mere expressions of opinion regarding the parties referred to therein. I am of opinion that the letter is fairly susceptible of the construction placed upon it, and that it did affirm the financial ability and responsibility of the Granite Company and of Boggs; that they were thoroughly reliable and good for any arrangements they might make with plaintiff.

It is sometimes difficult to distinguish between the expression of an opinion and of a fact; but courts generally hold that a statement as to the solvency or financial responsibility of a third person is a statement of fact, and not the mere expression of an opinion. *Einstein v. Marshall,* 58 **Ala. 152** (29 Am. R. 729) ; *Marsh v. Falker,* 40 N. Y. 562.

In the *Einstein* case, *supra,* the court says, at page 737 :

''Much must depend on the circumstances of the particular case. But when, as in this case, the person recommending knows that the object of the party procuring the recommendation is to obtain credit at a distance, knows that the proposed seller is unacquainted with the financial condition and credit of the proposed buyer, the law, in harmony with good morals and good neighborhood, requires that the same shall be faithfully and truthfully given. A representation, as fact, of that which the party knows to be false, or of that of the truth of which he has no knowledge or well-founded belief, falls below the standard of legal requirement. And if it turn out in

fact that the representation is false, and the seller is deceived and suffers loss in consequence of the sale he made on the strength of it, the party recommending must make good the loss. It is no excuse for him that he did not collude with the purchaser, that he was not interested in or benefited by the purchase, or that he did not know whether the representation he made was true or false. Good faith requires that what he represents as fact shall be true, or that, from a proper knowledge of the surroundings, he is justified in having an intelligent belief that what he asserts is true. Mere spirit of accommodation, or desire to serve a friend, we fear, cause many recommendations, which entail heavy loss on him who trusts, and is misled by them. It is time it should be known that he who thus knowingly, fraudulently, or even recklessly, enables one to cheat another, thereby shoulders the burden himself. Candor and good faith are what the law requires, for the law does not convert a mere recommendation into a guaranty. . . . . When, however, the testimony convinces the jury that the recommendation was knowingly false, and on the strength of such recommendation credit was given and a loss sustained, these, with the fact that the statements in the recommendation were false, constitute deceit and a right of action in favor of the person who was influenced thereby. And when given recklessly, or from favoritism, without knowing whether it is true or false, attended by the circumstances above postulated, these are proper facts, with the other testimony in the cause, to be weighed by the jury in determining whether or not the defendant was guilty of the deceit charged, and, unexplained, would authorize a verdict in favor of the plaintiff.''

This rule has its foundation in the old English case of *Pasley v. Freeman,* 3 T. R. (K. B. 1789) 51 (12 English Ruling Cases 235), and it has been generally adopted in this country. See *Crane v. Elder,* 48 Kans. 259; *Cowley v. Smyth,* 46 N. J. L. 380.

Even in Massachusetts, where a different rule is said to

prevail, the Supreme Court of that state, in *Andrews v. Jackson,* 168 Mass. 266, said:

"It is contended by the defendant that such a representation is necessarily, and as a matter of law, a mere expression of opinion, for which, however wilfully false, and however damaging in the reliance placed upon it, no action can be maintained. It is true that such a representation may be, and often is, a mere expression of opinion. But we think that it may be made under such circumstances and in such a way as properly to be understood as a statement of fact upon which one may well rely. In *Stubbs v. Johnson,* 127 Mass. 219, one of the representations in regard to a note was that it was 'as good as gold,' and the jury were instructed that, if this was intended as a representation of the financial ability of the maker of the note, it was a statement of a material fact, for which the defendant was liable. This instruction was held erroneous, 'because a representation as to a man's financial ability to pay a debt may be made either as a matter of opinion, or as a matter of fact; the subject of the statement does not necessarily determine which it is.' 'It is often impossible,' says Mr. Justice Colt further in the opinion, 'to determine, as matter of law, whether a statement is a representation of a fact, which the defendant intended should be understood as true of his own knowledge, or an expression of opinion. That will depend upon the nature of the representation, the meaning of the language used, as applied to the subject matter, and as interpreted by the surrounding circumstances, in each case. The question is generally to be submitted to the jury.' The opinion plainly implies that, if the jury had been left to determine whether there was a representation of the maker's financial ability to pay made as a matter of fact, and not as mere matter of opinion, they might have found against the defendant on his false representation that the note was 'as good as gold.' In *Belcher v. Costello,* 122 Mass. 189, there is also a strong intimation that the rule is as above stated. In *Saf-*

*ford v. Grout,* 120 Mass. 20, the representation set out in the declaration was that the maker of the note 'was a person of ample means and ability to pay said note, and that the note was good.' The plaintiff was allowed to recover. The court says of the representations: 'We must presume that they were legally sufficient to support the action; that is to say, that they were statements of facts susceptible of knowledge, as distinguished from matters of mere opinion or belief.' See also *Morse v. Shaw,* 124 Mass. 59; *Teague v. Irwin,* 127 Mass. 217.

"In two recent cases—*Way v. Ryther,* 165 Mass. 226, and *Kilgore v. Bruce,* 166 Mass. 136, 138—this court has expressed a disinclination to extend the rule which permits dealers to indulge with impunity in false representations of opinion. In the case now before us the notes were turned over to the plaintiff in part payment of the agreed price for land sold to the defendant. He professed to know, and probably did know, all about the financial standing of the maker of them, who lived in Boston. The plaintiff lived in a suburban town, and knew nothing of the maker. She was obliged to take the defendant's representations or to decline to deal with him until she could go to Boston and make an investigation for herself. He told her that he had lent money to the maker, and said, 'Do you suppose I would lend my money to anyone that was not good?' A representation that a note is as good as gold may be founded on absolute personal knowledge of the validity of the note, and upon an equally certain knowledge of the maker's financial ability. The known facts upon which financial ability depends may be so clear and cogent as to make the consequent conclusion, which ordinarily would be a mere matter of opinion, a matter of moral certainty which can properly be called knowledge. We cannot say, as matter of law, that this representation was not intended to be, and properly understood to be, a representation of facts within the defendant's knowledge."

We have often affirmed the same doctrine. *McKown v.*

*Furgason,* 47 Iowa 636; *Shuttlefield v. Neil,* 163 Iowa 470; *Davis v. Central Land Co.,* 162 Iowa 269; *Haigh v. White Way Laundry Co.,* 164 Iowa 143; *Hetland v. Bilstad,* 140 Iowa 411; *Severson v. Kock,* 159 Iowa 343.

And, as a rule, one speaking regarding the financial ability of another is held to a stricter accountability than if he were speaking of his own standing. *Lyon v. Briggs* (R. I.), 51 Am. Rep. 372.  In the case relied upon by appellant, *Albion Milling Co. v. First Nat. Bank* (Neb.), 89 N. W. 638, the representations were that the party "seemed to be doing well;" that "as far as he knew he was getting along nicely;" "I should say he would be good for that amount." These were all guarded expressions of opinion or belief, and not assertions of any fact.

II.   There was sufficient testimony to show that, at the time defendant made the statements in the letter, neither the company nor Boggs nor McCloud was financially responsible, and that they were each, in fact, insolvent; there was also testimony from which a jury might have found that neither was responsible in fact.

III.   Upon the question of defendant's knowledge of the condition of the firm and its members at the time he made the statement, the testimony is not strong.  It consists of two letters written by defendant in May of the year 1910, and proof of their reputation as to financial irresponsibility, in the city of Waterloo.

In one of the letters, in referring to a note against the Granite Co., sent to defendant's bank for collection, defendant said:  "Boggs is out of the city most of the time, but will get right after him and report the outcome." And in the other, referring to the same matter, he wrote: "We will make allowance on Granite Co. note as instructed.  I have gone after these people as hard as I can, but they are hard to get money out of." In addition to this, it was shown, over defendant's objections, that the general reputation of Boggs at Waterloo, Iowa, on or about July 1st, as to his

solvency and financial responsibility, was not good; and that the reputation of the Granite Co. at the same time was that they were very light financially. Again, it is shown that defendant knew the weak financial condition of the firm and of Boggs on December 24th, at a time he took up a note which he had negotiated at another bank, some time in June of the year 1910.

Other witnesses testified as to the reputation for insolvency of both the firm and of Boggs on or about July 1, 1910. Whatever else may be said of this testimony as to the reputation of the firm and of Boggs, it was certainly material as bearing upon the question of defendant's knowledge of the facts. Jones on Evidence (2d Ed.), Sec. 146; *Martin v. Mayer* (Ala.), 20 So. 963; *Hahn v. Penney*, 60 Minn. 487; *Lee v. Kilburn*, 3 Gray (Mass.) 594.

Whether or not such testimony is admissible to prove the fact of solvency, we need not at this time determine. It has been held admissible, however, by a great number of reputable courts. *Sweetser v. Bates*, 117 Mass. 466; *Ellis v. State* (Wis.), 119 N. W. 1110; *West v. St. Paul Nat. Bank*, 54 Minn. 466 (56 N. W. 54); *Bank of Middlebury v. Rutland*, 33 Vt. 414. Contra, *Stewart v. McMurray* (Ala.), 3 So. 47; *Phillips v. Bullard*, 58 Ga. 256; *Graff v. Brown*, 85 Ill. 89.

The testimony regarding defendant's knowledge of the insolvency in December, 1910, was admissible, as explanatory of defendant's conduct with Boggs and his firm, and with those who held their paper. But aside from the question of defendant's actual knowledge, there was enough to take the case to the jury, on the theory that defendant's statements in the letter purported to be based upon actual knowledge; and if he in fact did not know whether they were true or false, he is held liable for his deceit, on the theory that his assertion of knowledge, when in fact he did not know, is quite as culpable as if made with actual knowledge of their falsity. See *Davis v. Central Land Co.*, 162 Iowa 269, and the many cases cited. Whatever of conflict there may be, either real or apparent,

regarding this proposition, is now made clear by this last decision, and the rule there announced is the one supported by the great weight of authority.

Appellant's counsel learnedly contend that, where the statement is in the nature of an opinion, the rule just quoted is inapplicable, and that, in such cases, to establish *scienter*, it must be shown, not only that the statement was false, but that the party making it had no reason to believe it to be true, relying upon *Boddy v. Henry*, 113 Iowa 462, and other like cases. The rule there announced is inapplicable here. All that plaintiff need do, in the first instance, in any event, is to show that the statement was false in fact; that the defendant knew it to be false, or that he assumed to have knowledge of the truth, when in fact he did not have such knowledge. *McKown v. Furgason*, 47 Iowa 636; *Davis v. Central Land Co., supra.*

In this case, the letter itself shows that defendant was speaking of his own knowledge, and, the falsity of the statement being shown, this was all that plaintiff was required to show, in the first instance. Whether or not defendant's honest belief in the truth of the statements would exculpate him, we have no occasion now to decide. It may be said, however, that defendant is not to be charged for mere negligence. It must be shown that he either knew that the statements were false when he made them, or that he represented and assumed to have had knowledge, when in fact he did not.

Properly understood, and as explained in subsequent cases, the rule in *Boddy v. Henry, supra,* does not run counter to the one here announced.

IV. Counsel vigorously contend that there is no proof of any intent on the part of defendant to deceive or defraud. Such fact can rarely be proved by direct testimony, and hence the rule that such intent may be inferred; and if it be shown that the representations were false in fact, were known to the defendant to be false, and were made with intent that they

be acted upon, and in truth they are relied upon, intent to deceive and defraud may be inferred. This presumption or inference is not conclusive, but is sufficient to justify a jury in finding that this element essential to a recovery is established. *Davis v. Land Co., supra. Boddy v. Conover,* 126 Iowa 31; *Riley v. Bell,* 120 Iowa 618.

No bad motive on the part of defendant need be shown, nor need any benefit to him be proved. *Skeels v. Porter,* 165 Iowa 255; *Hubbell v. Meigs,* 50 N. Y. 480; *Cowley v. Smyth,* 46 N. J. L. 380; *Fitzsimmons v. Joslin,* 21 Vt. 129; *Spencer v. Taggart,* 162 Iowa 564; *Stoney Creek Co. v. Smalley,* 111 Mich. 321.

V. Upon the question of the measure of damages, the trial court instructed as follows:

"If, under the evidence in this case and the rules of law announced in these instructions, you find the plaintiff entitled to recover against the defendant, you will then determine the amount of damages, if any, to which the plaintiff is entitled. And, upon the question of the amount, if any, which the plaintiff is entitled to recover of the defendant, you are instructed that it can only recover of the defendant the damages, if any, which the plaintiff has sustained, which are the direct and immediate consequences resulting to said bank, by reason of said bank, or its cashier, E. H. Reimer, relying and acting upon the representations made by the defendant, as to the financial responsibility of the Central Iowa Granite Co., and E. A. Boggs. In this connection, it is claimed by the defendant that the loan made by the plaintiff bank to the Central Iowa Granite Co. and E. A. Boggs were all made by the plaintiff in violation of law, and in amount beyond the authority of the bank to make, and in consideration of a large and unusual rate of interest and discount, and not in reliance upon any representations made by the defendant. Upon this question, you are instructed that if you find from the evidence that the loans, if any, made by the plaintiff to the Central Iowa Granite Co., and to E. A. Boggs, were in violation of

law, and in sums beyond the authority of the bank to make, such fact will not relieve the defendant from liability for damages sustained by the bank, if you find such damages to be the direct and immediate consequences resulting to said bank by reason of said bank, or its cashier, relying and acting upon the representations made by the defendant, and you find the defendant liable to the plaintiff under the evidence and the instructions given you by the court.''

The majority say, first, that there was no testimony to justify this instruction. Next, that it is wrong in that defendant's liability, if any, could not exceed $2,000; and lastly, that, as Boggs, or the Granite Co., or both, paid plaintiff more than $2,000, no recovery can be had of the defendant.

To these conclusions, I cannot agree, and I think the majority overlook the nature of this action, and, consciously or unconsciously, treat it as an action upon a letter of credit, or a guaranty. If it were that, I might, perhaps, agree to the conclusion; but it must be conceded that the action is in tort, for deceit, and not for a breach of contract.

The fundamental difference between me and the majority is bottomed upon this distinction. If the majority would concede that this is an action of tort, and cite cases of that kind, rather than authorities in actions for breach of contract, we could come nearer to an agreement. But, as they make no distinction between the two kinds of action, I cannot, of course, agree to the conclusion reached.

That the measure of damages is different in the two classes of actions is elementary. The statute, Code Supplement, 1913, Section 1870, says that no liability of any person or firm for borrowed money shall at any time exceed 20 per cent. of the actually paid-up capital stock of the bank. The making of an over-loan is not made a criminal offense by statute. The provision was enacted for the benefit of the stockholders and depositors, and failure to comply with its terms in no manner affects the validity of an over-loan. *Benton County Sav. Bank v. Boddicker*, 105 Iowa 548; *Mills County Nat. Bank v. Perry*,

72 Iowa 15; *Gold-Mining Co. v. National Bank*, 96 U. S. 640; *Portland Nat. Bank v. Scott* (Ore.), 26 Pac. 276. The statute cannot be used to defeat the loan, nor may one guilty of a fraud hide behind it. *O'Donnell v. Providence & W. R. Co.*, 6 R. I. 211; *Kelly v. Muhs Co.* (N. J.), 59 Atl. 23.

A jury was justified in finding that the fraud was not the remote, but the proximate, cause of the loan; and the loans themselves were not invalid, even though greater than the statute authorized. The law was not enacted to protect one from the consequences of his own fraud or wrong, and the transaction was not illegal, in such sense that the parties themselves could avoid the contract. If they could not, then it is clear that a stranger to the transaction is not entitled to the benefits thereof. That is to say, the statute was not enacted for the benefit of those who might induce another to make loans of a bank, and the bank owed no duty, under the statute, to anyone but its depositors and stockholders. It is clear, I think, that the statute affords the defendant no protection. If the suit were upon a letter of credit or upon a guaranty unlimited as to amount, perhaps another rule would apply, for the reason that a loan within the limits of the statute would be held to have been within the contemplation of the parties. But the rule is not thus confined or limited, in actions of tort. The damages in such cases are those which directly and proximately follow as a result of the wrong, no matter whether contemplated or anticipated by the parties. *Fottler v. Moseley* (Mass.), 70 N. E. 1040.

Whether or not the fraud of the defendant was the proximate cause of plaintiff's loss, or whether it relied upon Boggs or the Granite Company; and whether or not it was justified, in reason, in so doing, were questions of fact for the jury, and the court correctly instructed upon this feature of the case.

That there is a marked distinction in the rule for admeasuring damages in actions for breach of contract and in actions sounding in tort is so fundamental that it is scarcely necessary to cite authorities for the proposition. In the former,

the rule is that the damages are such as either naturally, that is, in the usual course of things, follow from such a breach of contract itself, or, on the other hand, such as may reasonably be supposed to have been in the contemplation of the parties, at the time they made the contract, as the probable result of a breach thereof. *Mentzer v. The Western Union Tel. Co.*, 93 Iowa 752; *Hadley v. Baxendale*, 9 Excheq. 341; *Hopkins v. Sanford*, 38 Mich. 611; *Billmeyer, Dill & Co. v. Wagner*, 91 Pa. St. 92. While, in actions for tort, all damages which result from the defendant's wrongful act are properly chargeable to him, and it is entirely immaterial whether the particular consequences of his act could have been foreseen or were contemplated by the wrongdoer (*Vosburg v. Putney*, 80 Wis. 523; *Sloan v. Edwards*, 61 Md. 89), it is certain that, in actions for tort, the defendant should be held liable for the consequences of his act, although he, at the time, neither foresaw nor had them in contemplation. *Guille v. Swan*, 19 Johns. (N. Y.) 381; *Ehrgott v. Mayor*, 96 N. Y. 264. The case last cited contains probably the best discussion of the rule. It follows that, in actions for tort, the question of the amount of damages, and as to whether they were remote or proximate, is primarily for a jury. Doubtless, but for the statute (Code Supplement, 1913, Section 1870), the majority would concede these doctrines and hold the defendant liable, or at least agree with me in saying that the questions were for a jury. But construing this as if it made over-loans unlawful, or else reading the statute into defendant's representations, as if they were to be considered contractual in character, they limit recovery in any event to $2,000. That the statute does not impose a criminal liability and does not say that violation thereof is a misdemeanor is too clear for argument, and so I pass that by. I have never before seen it stated that statutory or other law should be read into false and fraudulent misrepresentations. Of course, this may be the law, although I have not before seen it announced; but if it is, there should be some authority for it. The majority have found none and,

after diligent search, I have been unable to discover any. Let us see what this means. Does it mean that I may practice deceit upon another, fraudulently induce him to part with his money, and then say, "Well, I am not responsible, for the reason that I did not think you would take me at.my word, and I had no reason to believe you would make an over-loan?" If so, then what becomes of the rule that it is entirely immaterial whether the resulting damages were foreseen, or whether they were in the contemplation of the parties when the fraud was perpetrated? As already stated, this statute is not a penal one. It was enacted for the benefit of the stockholders and depositors of the bank, and not for the benefit of one who induced the bank to make over-loans. As construed by the majority, it is made to operate to their prejudice, at the same time conferring a benefit upon a wrongdoer. Such statutes are not new, and they have uniformly been applied for the benefit of the bank, its stockholders and patrons. See cases hitherto cited.

The majority overlook, or fail to mention the fact, that this matter is already foreclosed in this jurisdiction, in the case of *Bank v. Boddicker,* 105 Iowa 548. That was an action on a bond given to indemnify the obligee from the failure of a principal to pay the plaintiff bank an indebtedness then owing, or which might thereafter be contracted by said principal to the bank. The bond was in the sum of $5,000, but the obligor undertook to stand good for any future indebtedness of his principal. The obligors on the bond, defendants in the action, pleaded the statute on which the majority rely, as limiting their liability; but this court, in answer to that plea, said:

"As the capital stock of the plaintiff was but $15,000, the amount of the bond was $2,000 in excess of the sum which the plaintiff was authorized to lend to the firm, and the amount of its debts to the plaintiff when this action was commenced was nearly five times that which it was authorized to borrow of the plaintiff. It is argued that the firm and the

plaintiff violated the law in creating the debt, and that the
sureties are thereby discharged. ., . . It will be noticed that
the statute does not make a loan of money in excess of the
per centum named void, and, the general rule applicable to
loans of that character is that they are not void, the prohibi-
tion of the statute being intended as a rule for the govern-
ment of the bank. *Union Gold-Min. Co. v. Rocky Mountain
Nat. Bank,* 96 U. S. 640; *Bank v. Perry,* 72 Iowa 15; *Pang-
born v. Westlake,* 36 Iowa 546; *Bank v. Slemmons,* 34 Ohio
St. 142; *Bank v. Savery,* 82 N. Y. 291; *Duncombe v. Railroad
Co.,* 84 N. Y. 190; *O'Hare v. Bank,* 77 Pa. St. 96; *Bank v.
Fall,* 71 Me. 49; 27 Am. & Eng. Enc. Law 380, 381. Since it
does not appear that the bond was given for an illegal pur-
pose, and the plaintiff can enforce as against G. A. Miller &
Sons the full amount of their debts, we are of the opinion that
the defendants may be liable in this action for the full amount
of the bond in suit."

Mark, this was an action on contract, so that the
majority are driven to the point of overruling this case in
reaching their conclusion, although they make no mention of
it in the opinion as presented. In fairness, this case should
be noticed, and, if it is to be overruled, there should be no
hesitation about it. The profession is entitled to know whether
that case still remains the law of the land. I shall not take
the time to specifically refer to other cases announcing the
same rule.

Consistently and logically, the majority, still proceeding
as if the action were for breach of contract, conclude that, even
if defendant were at one time liable for $2,000, he should not
now be held liable, because, at some time, the Granite Com-
pany, or Boggs, or both, paid the plaintiff bank that amount,
and this payment should be treated as settling all damages,
and no recovery can be had. I had never before seen this rule
applied in actions of tort, although I concede that, in certain
cases, it has been applied in actions for breach of contract. The
application of it in this case pointedly brings to my mind the

fallacy of the main argument of the opinion. Under the rule announced, plaintiff could not recover if it at any time made an over-loan to the Granite Company or to Boggs, although that over-loan were immediately fixed up, and the final liability of the Granite Company or Boggs or both was but $2,000, if, perchance, they or either had paid the plaintiff bank $2,000, during the course of their dealings.

Manifestly, this cannot be the law. Suppose, for example, that, upon the strength of defendant's misrepresentations, the plaintiff had loaned Boggs or the Granite Company $4,000 at one time, and that this had been paid, and thereafter, acting on the same representations, it loaned him or them $2,000 which was not paid, and suit was brought for the $2,000 damages suffered. Would anyone say that, because Boggs or the Granite Company had paid $4,000, there could be no recovery? I understand the majority to so affirm. I cannot lend my consent to such a rule.

It should be noted that much of the liability of Boggs and the Granite Company grew out of the purchase by the bank of paper ostensibly taken by them, and was not, in any true sense, a loan. In this respect, the case is not to be differentiated from the *Boddicker* case, *supra.*

I agree to the reversal because of error in the tenth instruction, reading as follows:

"It is claimed by the plaintiff that the representations made by the defendant were continuing in effect, and upon such question you are instructed that the representations made by the defendant as to the financial responsibility of the Central Iowa Granite Co. and E. A. Boggs, were continuing in effect, and that the plaintiff had the right to rely upon such representations, and to act thereon at any time within a reasonable time after such representations were made by the defendant. And, if you find from the evidence that, within a reasonable time after such representations were made by the defendant, he learned and knew that the Central Iowa Granite Co. and E. A. Boggs were not financially responsible;

and that they were not able to meet any obligations which they might incur to the plaintiff bank, it was then the duty of the defendant to advise the plaintiff that said Central Iowa Granite Co. and E. A. Boggs were not financially responsible and were not able to meet any obligations which they might incur to the plantiff.''

The error here, in my opinion, is in treating defendant's representations as continuing ones. This would make them guaranties, and plaintiff's action is not bottomed on that theory. That this instruction was erroneous, see *Goldsmith v. Stern*, 84 N. Y. Supp. 869; *Hotchkin v. Third Nat. Bank* (N. Y.), 27 N. E. 1050; *Bradley v. Seaboard Nat. Bank* (N. Y.), 60 N. E. 771; *Lowdon v. Fisk* (Tex.), 27 S. W. 180; *Cortland Mfg. Co. v. Platt* (Mich.), 47 N. W. 330; *Reid, Murdoch & Co. v. Kempe* (Minn.), 77 N. W. 413; *Burchinell v. Hirsh* (Colo.), 39 Pac. 352; *Atlas Shoe Co. v. Bechard* (Me.), 66 Atl. 390. Much more might be said; but, as I agree to the conclusion, it is perhaps needless to encumber the records with any further protest.

PRESTON, J., concurs in this dissent.