## WYOMING TRUST CO. OF CASPER v. MONTGOMERY, ET AL.

(No. 1447; May 8, 1928; 267 Pac. 77)

*Brome & Brome* and *Thomas M. McKinney,* for appellants.

309

*A. M. Gee* and *C. A. Zaring,* for respondent.

RINER, Justice.

This was an action on a written guaranty, signed by the appellants, J. H. Montgomery and James A. Quiner, and three others—all of whom were, at the time, officers and directors of the Manderson State Bank of Manderson, Wyoming. The guaranty was delivered to the National

Bank of Commerce of Casper, Wyoming, and by it transferred to the plaintiff and respondent Wyoming Trust Company, also of the city last mentioned. The District Court of Big Horn County, sitting without a jury, rendered judgment against the appellants for the full amount of the guaranty, to-wit, $25,000. The cause is before us for review on direct appeal.

The issues in the trial court were made up thus: Plaintiff's petition, in its first paragraph, after alleging its corporate existence under Wyoming laws, and that the National Bank of Commerce of Casper was organized as a national bank under the laws of the United States—both institutions doing business in Casper, Wyoming—set out that the latter suspended operations June 10, 1924; that the Manderson State Bank, also incorporated in Wyoming, transacted its business at Manderson in that state, having one Fred C. Sproul as its caashier, and ceased to function about May, 1924, being in liquidation since then. The second paragraph of the pleading alleges, that on January 11, 1922, to enable the Manderson State Bank and its officers, or either of them, to obtain credit from the National Bank of Commerce, and to sell, discount and transfer to said bank the notes of the former, and in consideration of the National Bank of Commerce extending credit to the Manderson State Bank and its officers by purchasing from it and its officers, bills, notes and other evidences of indebtedness, the defendants, with others, entered into an agreement with the National Bank of Commerce, the terms of which are set out *verbatim*. Therein it is recited, after mention of the payment of a consideration "of One Dollar and other good and valuable considerations" paid by the National Bank of Commerce, designated in the agreement as vendee, to the signers thereof, receipt of which they acknowledge, that, at the vendee's request and to enable the Manderson State Bank, referred to as the vendor, or its officers, to sell, discount and transfer, from time to time, to the vendee, notes and other written evidences of

indebtedness owned by the vendor or in whose sale, discount or transfer the vendor or its officers had an interest, without recourse on the vendor, the signers—

"jointly and severally guarantee the full and prompt payment to the said Vendee at maturity and at all times thereafter of any and all such notes and written evidences of indebtedness as said Vendee may have heretofore purchased or rediscounted from said Vendor, or may rediscount or purchase or acquire at the request of the said Vendor, whether endorsed by the Vendor with or without recourse, or purchased as aforesaid without endorsement by the Vendor, and any and all indebtedness of any and every kind which the Vendor may incur to the Vendee, together with interest at the rate as agreed per annum from date taken until paid; and we jointly and severally agree to pay, in addition thereto, all costs, expenses and reasonable attorney's fees at any time paid or incurred in collecting or endeavoring to collect any of said notes or other evidences of indebtedness, or any part thereof, or in or about enforcing the same, it being understood that the total recovery in any suit under this guarantee shall not exceed the sum of Twenty-Five Thousand Dollars."

The agreement then recites that the liability thereunder—

"shall not in any way be affected or impaired by any renewal, extension, sale, pledge, surrender or compromise of any of such notes or written evidences of indebtedness, nor by the acceptance by the said Vendee of any security for any of the indebtedness represented thereby, or by reason of any failure, neglect or omission on the part of said Vendee to realize upon any of said obligations."

Its signers jointly and severally waived "any and all notice concerning any matters arising under this guaranty," as well as all diligence in collection, presentment for payment, demand, protest and notice of dishonor, default or non-payment as to any of the obligations covered by the guaranty. Provisions were made in the agreement that should govern situations caused by the death of any of the signers, that the guaranty should be construed accord-

ing to the laws of Wyoming, and that it should "inure to the benefit of the successors, legal representatives and assigns of said Vendee."

The petition then alleges, substantially, the acceptance of the guaranty by the National Bank of Commerce, and the liability of the signers as outlined in the pleaded agreement; that, after the execution of the guaranty and in reliance thereon, the National Bank of Commerce "purchased, discounted and acquired," from the Manderson State Bank and from its officer, Fred C. Sproul, three promissory notes, which are set out *verbatim*. The first note was dated Manderson, Wyo., May 6, 1924, was for $2050, payable to the order of Fred C. Sproul, due in 180 days after date with ten per cent annual interest until paid, and was signed by F. C. Emerson. The note bore the endorsement of Fred C. Sproul in blank. The second note was dated Manderson, Wyo., October 13, 1923, was for $4500, payable to the order of Fred C. Sproul, was due in 180 days after date with ten per cent annual interest until paid, and was signed by Richard Mott and Grace Mott. This note likewise carried the endorsement of Fred C. Sproul in blank. The third note was dated Casper, Wyo., December 18, 1923, was for $13,000, payable to the order of the National Bank of Commerce of Casper, Wyoming, due six months after date with eight per cent annual interest until paid. A clause of this note recited that its signer had deposited with the National Bank of Commerce as collateral security for its payment the note of Claude Waln, dated December 20, 1922, for $13,000, payable to Fred C. Sproul, and power was by this clause vested in the National Bank of Commerce at its discretion to sell said note to pay the principal obligation. This third note was signed by Fred C. Sproul.

Plaintiff's pleading also avers that during the time mentioned by it and at the time these notes were acquired by the Manderson State Bank and sold to the National Bank of Commerce, Fred C. Sproul was the cashier and

managing agent of the Manderson State Bank; that all these notes were in fact the property of the bank last mentioned; that all moneys paid by the National Bank of Commerce in the purchase or rediscount thereof, were paid to the Manderson State Bank; that in taking and discounting said notes, Fred C. Sproul was acting as that bank's agent, as one of its officers and not in his individual capacity, and did not receive any of the proceeds of the notes; that the collateral note attached to the above mentioned note of Sproul was the note of Claude Waln and Rose Nellie Waln for $13,000, and evidenced the same indebtedness as the Sproul note; and that the collateral note was accepted by the National Bank of Commerce under the terms of the guaranty and held until maturity, at which time the Walns were insolvent and had left Wyoming.

The petition further avers that on or about June 10, 1924, plaintiff purchased of the National Bank of Commerce all the notes above described, together with the collateral note and the guaranty agreement already mentioned; that plaintiff is now the owner and holder in due course of these notes and the guaranty, and is the successor in interest in said property to the National Bank of Commerce. Allegations as to attorney's fees claimed to be due under the guaranty, the amount asserted to be due plaintiff on account of the notes thus guaranteed, and prayer for judgment, conclude the pleading.

An amended answer was filed by the defendants, which contained three separately stated defenses. The court below sustained a demurrer to the third defense of the amended answer and leave was given to file a second amended answer. This was done and in it were incorporated four separately stated defenses, the first of which, after admitting the allegations contained in the first paragraph of plaintiff's petition, amounted to a general denial of the allegations of plaintiff's petition.

The second defense was interposed against the Sproul note of $13,000, and pleaded in substance that Waln, being

indebted to the National Bank of Commerce and the Manderson State Bank in the sum of $57,000, including the aforesaid note of Claude Waln and Rose Nellie Waln for $13,000, these banks jointly authorized and directed Sproul, as cashier of the Manderson State Bank, to agree with Claude Waln that if he would surrender to Sproul certain real and personal property, then owned by Waln, the two banks would cancel Waln's indebtedness of $57,000, including the $13,000 note dated December 20, 1922; that pursuant to this authority, a written agreement was entered into between Sproul and Waln, the terms thereof being pleaded in full; that Waln transferred to Sproul the property as agreed, for the use and benefit of the banks, and the Waln note of December 20, 1922—the collateral note referred to in plaintiff's petition—and its renewal made by Sproul on December 18, 1923, were paid; that the Sproul note was not discounted by the Manderson State Bank and neither it nor its officers had any interest therein at any time.

The third defense related to the Mott note, which is alleged to be a renewal of a prior note executed by the Motts and discounted by the Bank of Salt Creek at Lavoye, Wyoming; that the indebtedness represented by this renewal note was originally created by a loan made by the Manderson State Bank to Mott, and was secured by certain described real estate and chattel mortgages upon property owned by the Motts; that Sproul, as cashier of the Manderson State Bank, after negotiations in the latter part of November, 1923, with Mott, upon authority given Sproul by the bank's directors, entered into an agreement in writing with Richard Mott and Grace Mott, wherein it was covenanted that the Manderson State Bank would surrender to Mott his note for $4500, dated at Manderson, Wyoming, October 13, 1923, and all other notes held by said bank against Mott, in consideration of his conveyance to the bank of the mortgaged real and personal property to which reference has already been made; that this con-

tract was duly executed by Sproul and the Motts and the property turned over to the bank, which immediately took possession thereof; that the Manderson State Bank was unable to obtain possession of the Mott note aforesaid and it was not returned to Mott, as agreed; that on March 1, 1924, the National Bank of Commerce advised the Manderson State Bank that it had "purchased or taken" from the Bank of Salt Creek the Mott note; that none of the directors or officers of the Manderson State Bank—except one Arthur K. Lee, who was the President and chief managing officer of the National Bank of Commerce and also the Vice-President and a director of the Manderson State Bank—either authorized or knew of the proposed purchase by the National Bank of Commerce of this note, which defendants say was not acquired from the Manderson State Bank by the National Bank of Commerce in any manner whatsoever, nor from Fred C. Sproul, but "purchased or taken" from the Bank of Salt Creek aforesaid, with full knowledge that it had been paid.

The fourth defense sets out that the authorized capital of the Manderson State Bank was $10,000; that it had no surplus and could not lawfully loan to any person or corporation of its funds a sum in excess of $2,000; that each of said promissory notes described in plaintiff's petition, "if the same were made either by or on behalf of the Manderson State Bank," were and are excess, and unlawful loans, not covered by the guaranty executed by the defendants; that the National Bank of Commerce knew that the Manderson State Bank could not lawfully loan to one person a sum in excess of $2,000, and that an obligation in in excess of said sum was not contemplated by the terms of the guaranty executed by the defendants; that plaintiff did not purchase said notes in the ordinary course of business before maturity for value.

This fourth defense of the second amended answer was, upon plaintiff's motion, stricken by the court. An exception was saved to this ruling. A reply was filed by the

plaintiff, denying generally the material allegations of the second amended answer.

The sustaining of plaintiff's demurrer to the third defense in defendant's amended answer is assigned as error, but, as defendants were given leave and availed themselves of that right to file a second amended answer on the authority of Arp & Hammond Hardware Co. v. Hammond Packing Co., 33 Wyo. 77, 236 Pac. 1033, any error in making this ruling was waived.

Complaint is made that the trial court committed error in striking from defendants' second amended answer the fourth defense thereof. The argument of appellants, as we understand it, appears to be this: Inasmuch as, for the purpose of the motion to strike, it is to be taken as conceded that the notes, upon which recovery is herein sought under the guaranty, represent excess loans of the Manderson State Bank to the signers of the notes in violation of Sections 5146 and 5147, Compiled Statutes of Wyoming 1920, that the National Bank of Commerce knew that fact when it purchased and discounted these notes, and that plaintiff was not a holder in due course for value from the bank last mentioned, this action cannot succeed. In support of this view, but one case is cited in appellants' brief, but that is claimed as "on all fours in principle" with the case at bar. The authority thus relied on is Farmers' Savings Bank of Morrison v. Jameson, 175 Iowa 676, 157 N. W. 460. An examination and analysis of that decision establishes, we think, that it should not have persuasive application here. In that case, Jameson, a stranger to the Farmers' Savings Bank, wrote a letter to it, wherein he stated that the company which the bearer of the letter represented was "thoroughly reliable and good for any arrangements they may make with you." The party to whom the letter was given took it to plaintiff's cashier, and the Farmers' Savings Bank, operating under a statute similar to Sections 5146 and

5147, supra, and thereby forbidden to loan more than $2,000 to any one borrower, loaned to the company more than $60,000, which the company could not repay. Plaintiff, Farmers' Savings Bank, recovered judgment for $40,000. The Appellate Court reversed this judgment, holding that the phrase ''good for any arrangements'' should not be construed as an unlimited guaranty, but only for $2,000—the amount mentioned in the statute as a permissible loan. The weight of this decision would seem to be rather impaired by the strong dissent of two judges who pointed out, that the statute limiting the amount of loans to any person or corporation—

''was enacted for the benefit of the stock holders and depositors of the bank, and not for the benefit of one who induced the bank to make overloans. As construed by the majority, it is made to operate to their prejudice, at the same time conferring a benefit upon a wrongdoer.''

The case is not at all similar in its facts to that at bar. There, the letter of guaranty was given by a perfect stranger to the bank which made the loans. Here, the contract of guaranty was executed, as the record shows, by individuals who were officers, directors and stock holders of the bank. There, literally taken, the letter was for the express purpose of inducing a loan for any amount, i. e. in violation of the statute. Here, the contract deals solely with the payment at maturity of the paper purchased or discounted by the National Bank of Commerce from the Manderson State Bank. There, the letter was possibly ambiguous—at least its meaning was open to construction. Here, the terms of the contract are clear, and the limitation in amount is absolute.

The case at bar, in its facts, more closely resembles the earlier case of Benton County Savings Bank v. Boddicker, 105 Iowa 548, 75 N. W. 632, also decided by the Supreme Court of Iowa, but for some reason not referred

to by the majority opinion in the Jameson case, supra, though the minority opinion makes mention of it at quite some length. The action there was upon a bond given to "fully protect and indemnify the said Benton County Savings Bank or its assigns against any and all losses by reason of the failure of the said G. A. Miller & Sons to pay their indebtedness now owing (or which may be contracted hereafter) to the said Benton County Savings Bank."

The penal clause in the bond was limited to $5,000. The bond was given at a time when G. A. Miller & Sons were indebted to the bank for some $6,000. Subsequently, additional indebtedness was incurred to over $14,000. The defendants, sureties on the bond, pleaded the statute regarding excess loans, hereabove referred to, but the Appellate Court, in holding such defense unavailing, said:

"As the capital stock of the plaintiff was but $15,000, the amount of the bond was $2,000 in excess of the sum which the plaintiff was authorized to lend to the firm, and the amount of its debts to the plaintiff when this action was commenced was nearly five times that which it was authorized to borrow of the plaintiff. It is argued that the firm and the plaintiff violated the law in creating the debt, and that the sureties are thereby discharged. It is true that every contract must be construed with respect to the law applicable to it, and that contracts in violation of law are void; but *it does not appear that the bond was designed to accomplish or to promote an illegal purpose. It was not restricted to indebtedness which should have been or should be thereafter incurred for borrowed money, and the prohibition of the statute is against liabilities for money borrowed.* It will be noticed that the statute does not make a loan of money in excess of the per centum named void, and the general rule applicable to loans of that character is that they are not void, the prohibition of the statute being intended as a rule for the government of the bank. Union Gold-Min. Co. v. Rocky Mountain Nat. Bank, 96 U. S. 640; Bank v. Perry, 72 Iowa 15, 33 N. W. 341; Panghorn v. Westlake, 36 Iowa 546; Bank v. Slemmons, 34 Ohio St. 142; Bank v. Savery, 82 N. Y. 291; Dun-

comb v. Railroad Co., 84 N. Y. 190; O'Hare v. Bank, 77 Pa. St. 96; Bank v. Fall, 71 Me. 49; 27 Am. & Eng. Enc. Law, 380, 381. Since it does not appear that the bond was given for an illegal purpose, and the plaintiff can enforce as against G. A. Miller & Sons the full amount of their debts, we are of the opinion that the defendants may be liable in this action for the full amount of the bond in suit."

We have italicized that portion of the quotation from the opinion which would appear to distinguish the decision from that in the Jameson case. In the case at bar, it appears not only that the contract was not given for an illegal purpose, but also that it was not given to secure or induce loans to be made by the Manderson State Bank at all. It was given solely to protect the National Bank of Commerce on any evidences of indebtedness which the latter purchased, rediscounted or acquired from or at the request of the Manderson State Bank.

That the Boddicker case was not overruled, on the point it decided as above, by the Jameson decision, is made clear by the quite recent authority from the same court of German American State Bank v. Farmers' and Merchants' Savings Bank, et al., 203 Iowa 276, 211 N. W. 386. There, one S., its Vice-President, executed the note in suit to K., the Cashier of the Farmers' etc. Bank, the note being executed for the bank's use and benefit. On or about the date of its execution, it was transferred to the German etc. Bank for value, the payee endorsing the same in blank. Prior to the execution of the note, the Farmers' etc. Bank, by its Vice-President and Cashier aforesaid, had executed a written guaranty to the German etc. Bank, "guaranteeing the payment of all rediscounts, notes or other negotiable paper received by" that bank from the Farmers' etc. Bank, "which were endorsed personally by any officer of the bank or by any individual therefor." The note was not entered upon the books of the Farmers' Bank and it was conceded that the loan was "made in

excess of the authority of the bank to loan to its officers,''
and for that reason was withheld from the bank's books.
Judgment was given in the trial court against the Farm-
er's etc. Bank in favor of the German etc. Bank, but the
court declined to fix a lien therefor upon the assets of
the former bank, which had passed to another banking
corporation. The German etc. Bank appealed to estab-
lish the lien, and the Farmers' etc. Bank filed a cross-ap-
peal. In disposing of the contention of the bank last
mentioned, that the loan was excessive and known by the
German etc. Bank to be so, the court said:

"We come now to consider the cross-appeal of the
Farmers' and Merchants' State Bank. The cross-appeal
is from the judgment entered in appellant's favor against
the bank. It is contended by cross-appellant that the
written instrument, executed September 13, 1916, by it to
appellant, by the terms of which it undertook to guaran-
tee the payment by the old bank of negotiable instru-
ments received by appellant therefrom, which were in-
dorsed personally by an officer of the bank or any in-
dividual in its behalf, was not authorized by resolution of
the board of directors, and that same was in excess of the
bank's statutory authority. Savings banks are authorized
—'to discount, purchase, sell, and make loans upon com-
mercial paper, notes, bills of exchange, drafts, or any
other personal or public security.' Section 9184, Code
1924.

"The note was executed for and on behalf of the bank,
which discounted it to appellant for cash. It is further
contended by cross-appellant that the loan was exces-
sive, and this was known to appellant. It is well settled
by the decisions of this court that a corporate debt con-
tracted in excess of the maximum limitation in its articles,
is not void because thereof. Junkins v. Plain Dealer Pub.
Co., 181 Iowa 1203, 165 N. W. 339; Farmers' Sav. Bk. v.
Jameson, 175 Iowa 676, 157 N. W. 460, L. R. A. 1916E,
362; Savings Bank v. Boddicker, 105 Iowa 548, 75 N. W.
632, 45 L. R. A. 321, 67 Am. St. Rep. 310. The savings
bank received and retained full value for the note neces-
sarily with the knowledge of the officers thereof. By do-

ing so, it acquiesced in the transaction, thereby ratifying it. Bank v. Bank, 122 Iowa 737, 98 N. W. 606.''

In the case at bar the record shows that the liability ledger of the Manderson State Bank listed the indebtedness in suit as a liability of that bank, and as being held by the National Bank of Commerce. It is undisputed that the Manderson State Bank received full credit for these notes upon the books of the National Bank of Commerce and paid the interest thereon to the latter as it became due. The cashier of the Manderson State Bank knew these facts. Its Vice-President, A. K. Lee, knew them. The defendants were directors—one of them being the President of the Manderson State Bank and the other its coordinate Vice-President also—comprising the managing board of that institution, and must, in the absence of evidence to the contrary, be presumed to know them too. It is said that the Cashier of the Manderson State Bank and its Vice-President Lee arranged for the taking over by the National Bank of Commerce of the indebtedness represented by these notes and the various renewals thereof, and that the defendants were not consulted about these matters. But the record shows that the defendant Montgomery arranged for the carrying of the Mott and Emerson notes by the National Bank of Commerce, and the defendant Quiner, as a notary, took Cashier Sproul's verification to the latter's certificate to the Mott note which was sent to the National Bank of Commerce to complete its records in lieu of the burned note previously held by the Bank of Salt Creek. In this connection, the language of the Supreme Court of the United States, in Martin v. Webb, 110 U. S. 7, 28 L. Ed. 49, may well be recalled, where, speaking of a cashier allowed by the directors of a bank to deal with third parties in a particular manner, it was said:

"When, during a series of years or in numerous business transactions, he has been permitted, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the Bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the Bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the Bank and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the Bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

This court has already declared the rule to be as stated in the Boddicker and German American State Bank cases, supra, on the point of allowing a bank to recover from its debtor, even though the loan was an excess one in violation of the statute. See Platte County State Bank v. Frantz, 33 Wyo. 326, 239 Pac. 531; McDonald v. Mulkey, 32 Wyo. 144, 231 Pac. 622; State Bank v. Haun, 30 Wyo. 322, 222 Pac. 45.

In Harriet State Bank v. Samels, 164 Minn. 265, 204 N. W. 938, where, in an action on a bond taken to secure payment of a bank's notes, the statute prohibiting the latter from making a loan to one person of more than fifteen per cent of its capital and surplus was urged as a defense, the court remarked:

"Citing Section 7677, G. S. 1923, appellants contend that the bank was not authorized to accept the undertaking of the surety, because the amount exceeded 15 per cent of the bank's capital and surplus. That section relates to loans, and not to security for loans. A bank is not prohibited from taking any amount or kind of security to protect it against

possible loss from loans already made. The purpose of the statute is to prevent disaster to a bank by loans of a large portion of its funds to any one business concern. Trumer v. South Side Bank, 139 Minn. 222, 166 N. W. 127.''

In National City Bank v. Taylor, (Tex.) 293 S. W. 613, the action was upon a guaranty of payment of notes and other paper rediscounted by the plaintiff-bank for the Guaranty State Bank, by reason of the nonpayment of a note for $10,000 sent to plaintiff by the latter bank for rediscount. The information received by the plaintiff-bank was to the effect that the Guaranty State Bank had loaned to the borrower more than its legal limit, and decided temporarily to relieve itself of the excess loan, with the understanding that it would be taken up when the amount thereof had been reduced by the borrower. It was not only understood that the note was held and owned by the Guaranty State Bank, but it was also stated that it made up an overloan to the borrower. It was undisputed that none of the guarantors, except one or two of them, ever saw or knew of the note in question until after the plaintiff bank had discounted it; that the note was never entered on the note or discount register or liability register of the State Bank; that the note was never entered on the bank's books as one of its assets; that no loan of the date of the note to the borrower was authorized by the board of directors; that the taking of this note from the borrower was unauthorized by the board of directors, neither was the transfer or discount of the note ever authorized, consented to or ratified by the board. The statutes of the state forbade the rediscount of the bank's bills and notes without the consent of the board of directors of record. In holding adversely to the contention of the guarantors that the guaranty was unenforceable because the transfer of the note by the officers of the bank was *ultra vires* and void by positive provision of law, and the terms of guaranty included only notes lawfully transferred for rediscount, the court said:

"The makers' promise to pay, and to pay when due, is not affected in any wise with the exceeded authority of the bank officers to transfer the note for rediscount for the bank. It has nothing to do with the consideration or the promise to pay. And the note, for reasons inherent in itself, was not legally void and unenforceable against the makers, who stood first bound to pay it. It was in all respects a valid and legal note, which was genuinely executed by the makers, and did not belong to a class reprobated by public policy, or in violation of positive law, or against morality. As firmly settled, it is only where the note or contract is void for illegality, in fact or declared so by terms of law read into it, that the guaranty must fall with it, because the court will not enforce a guaranty upon a note or contract where the contract or note itself ought not to be enforced against any one. Howard v. Smith, 91 Tex. 8, 38 S. W. 15; Fuqua v. Brewing Co., 90 Tex. 144, 37 S. W. 418; 28 C. J., Sec. 36, p. 909; 12 R. C. L., Sec. 24, p. 1072; 2 Elliott Contracts, Sec. 1094."

In Birken v. Tapper, 45 S. Dak. 600, 189 N. W. 698, it was held that want of power on the part of a cattle loan company to loan money on notes secured by chattel mortgages on cattle, and want of authority of the company or its president to endorse the notes, did not relieve a guarantor, who guaranteed payment of the notes to the endorsee.

Mitchell Street State Bank v. Froedtert, 169 Wisc. 120, 170 N. W. 822, was an action by the Mitchell Street State Bank upon a contract of guaranty executed in its favor, by which Froedtert and Eller jointly guaranteed the payment of all debts due or which became due or owing by the S. Lumber Company and the Eighth Avenue Lumber Co., and by Eller, whenever the same or any part thereof should become due. The guaranty was dated April 1, 1911, and, at the time that it was given, there was an outstanding indebtedness of some $10,000 held by the bank against the lumber companies or Eller. In response to the contention of the defendants that the excess loan statute of the state relative to banks, was a defense to plaintiff's suit to recover

this indebtedness, through the guaranty, and in affirming the judgment below permitting such recovery, the following language was used:

"It is further argued by counsel for appellant that the plaintiff violated Sections 2024-32 and 2024-34, Stats., limiting the liability of any person to any bank and prohibiting loans to officers except upon certain conditions.

"It does not appear that there has been any violation of the above statutes for several reasons. In the first place, we know of no reason why the guarantors could not guarantee the payment of existing indebtedness to the plaintiff at the time the guaranty was made, even though such indebtedness execeded the statutory limitation."

In Nielsen v. Davidson, 66 Cal. App. 442, 226 Pac. 835, plaintiff sued defendant upon a written contract guaranteeing the payment of two promissory notes in the sum of $6250. The contract of guaranty, guaranteed to the bank which took the notes the payment thereof in the event that the bank "should see fit at any time to purchase or carry the notes." The notes were made payable to the First National Bank of Palo Alto, and were by it assigned to the plaintiff, who commenced the action. Judgment for the full value of the notes was recovered, and, in affirming that judgment, the California District Court of Appeals said:

"The further contention is urged that the court erred in refusing to admit evidence showing the amount of the subscribed capital stock and surplus of the Palo Alto bank. The point is that the face value of these two notes exceeded 10 per cent of the capital stock and surplus of the bank, and that accordingly the bank was prohibited from purchasing the notes under the provisions of U. S. Compiled Statutes, Sec. 9761. Aside from the fact that this matter was not put in issue by any of the pleadings, it is a sufficient answer to the appellant to say that any violation of the federal banking act was a question which concerned the United States alone. Appellant's point is that, as the guaranty in suit is conditional upon the bank's either pur-

chasing or carrying the notes, and as the bank could not carry both notes if in excess of 10 per cent of its capital and surplus, then perforce the bank could not fulfill the conditions of the guaranty, and the whole, therefore, must fall. But such is not the penalty of the Federal Banking Act. At the instance of the United States the bank might be subjected to the forfeiture of its charter, and the officers might be required to personally make good the amount of the excess; but none of these matters may be urged by the debtor upon a loan or obligation in excess of the statutory limitation.''

A review of this decision was subsequently denied by the Supreme Court of California.

In the case at bar it does not appear from the record that any excess loan was made by the Manderson State Bank because of the contract of guaranty in suit here. The contract of guaranty was not limited to the protection of indebtedness created by reason of excess loans of the Manderson State Bank. It protected all notes and written evidences of indebtedness which the National Bank of Commerce had previously purchased or discounted from the Manderson State Bank or might thereafter rediscount, purchase or require at its request. The loans represented by the paper it thus took had all been made by the Manderson State Bank before the National Bank of Commerce became at all interested in the transaction. The defendants, as officers, directors and stockholders of the Manderson State Bank, were obviously advantaged through these loans being carried by the National Bank of Commerce. As we have seen, no case has been cited by appellants holding a guaranty of the sort now under consideration invalid, and our search has failed to find any. The decisions most closely analogous to the facts presented by the record, rule to the contrary. There is no good reason that we can see why the obligee of the guaranty contract under consideration here or its assignee should be deprived of a recovery in accordance with the terms thereof, when it not only did not participate in making the excess loans, but under our

decisions and the great weight of authority, the very bank which made them could recover on the indebtedness.

In our view of the record, the allegations of the fourth defense of defendants' second amended answer interposed no obstacle to the recovery sought by the plaintiff, and it therefore follows that the court's action in striking out that defense constituted no error, the demurrer to the third defense of defendants' amended answer having been properly sustained. Columbia etc. Assn. v. Clause, 13 Wyo. 166, 78 Pac. 708.

It is next insisted that because of the two contracts entered into between Sproul and the Walns and the Motts, whereby the latter turned over certain property to Sproul for the benefit of himself and his associates—these associates being the directors and officers of the Manderson State Bank and the parties who authorized and directed Sproul to enter into the contracts—the note of Sproul and the note of the Motts held by the National Bank of Commerce, were paid. The Sproul note, it will be remembered, the record shows was merely given to effect a renewal of the Waln indebtedness, so that the National Bank of Commerce would not be holding past due paper. The Waln note was held as collateral to the Sproul note thus given. While it is true that by these contracts Sproul and his associates agreed to release the Motts and the Walns from liability on all notes given by them to Sproul, his associates or the Manderson State Bank, in consideration of the surrender to Sproul of certain of the debtors' property, it nowhere appears in the record that the National Bank of Commerce ever was a party to the agreements, or ever assented thereto. It never authorized or ratified any arrangements of this character. Indeed, the testimony stands undenied in the record that the settlements made by Sproul with the Walns and with the Motts, were not made to discharge the liability of the Manderson State Bank to the National Bank of Commerce on the Waln and Mott paper which the National Bank of Commerce held for the Man-

derson State Bank. The actions of the parties are in harmony, too, with this testimony concerning these settlements, for interest was paid through Sproul on the note given by him after the settlement with the Walns had been completed.

The fact that A. K. Lee was President of the National Bank of Commerce and also Vice-President of the Manderson State Bank, leads to no different conclusion as to the legal effect of these settlements. As President of the National Bank of Commerce he had no authority by virtue of his office to bind the bank by releasing existing obligations held by it, and hence had no authority to make such an agreement on behalf of it, as these contracts show. 3 R. C. L. 442, Sec. 69; 28 L. R. A. (N. S.) 502, note. This is especially so where, as here, he was dealing with an obligation upon which he himself was personally liable as guarantor to the National Bank of Commerce. Gallery v. National Exchange Bank, 41 Mich. 169, 2 N. W. 193, 32 Am. Rep. 149. It was not proven that the governing board of the National Bank of Commerce had ever authorized Lee to enter into any such arrangements on its behalf. It is undisputed also that the National Bank of Commerce obtained nothing from the property received by Sproul and his associates under the contracts of settlements with the Motts and the Walns, except that from the proceeds resulting from the sale of the Waln property, the current interest was paid to the National Bank of Commerce on the Sproul note, as already pointed out. The case of Schrader v. Manufacturers' National Bank of Chicago, 133 U. S. 67, 33 L. Ed. 564, is cited as pertinent to the facts before us, but we do not so read that case. It involved the enforcement of a liability upon stockholders of a failed national bank. The People's Bank of Belleville, which held the obligations protected by the guaranty in that case, had—as was specifically found by the master, such finding being approved by the trial court—assented to and joined in the arrangement whereby the obligor on the notes discounted

for the Manufacturers' National Bank with the People's Bank was released by the agreement of Holmes, the President of the Manufacturers' National Bank, in consideration of the transfer to Holmes of certain property held by the obligor. No such situation exists here. The decision can be distinguished from the case at bar in other respects as well, but it is unnecessary to pursue the discussion further.

It being our conclusion that no valid defense to the action has been established by the record before us, the judgment of the trial court should be and is affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.